**AMERICAN INTERNATIONAL GROUP, INC., Consolidated Derivative Litigation.**

**American International Group, Inc., Plaintiff,**

**v.**

**Maurice R. Greenberg and Howard I. Smith, Defendants.**

**C.A. No. 769–VCS.**

Court of Chancery of Delaware.

Submitted: Nov. 12, 2008.
Decided: Feb. 10, 2009.

Stuart M. Grant, Esquire, Megan D. McIntyre, Esquire, John C. Kairis, Esquire, Christine M. Mackintosh, Esquire, Catherine Pratsinakis, Esquire, Grant & Eisenhofer P.A., Wilmington, Delaware, Counsel for Teachers' Retirement System of Louisiana and Co–Lead Counsel for the Plaintiffs.

Peter C. Harrar, Esquire, Stacey T. Kelly, Esquire, Wolf Haldenstein Adler Freeman & Herz LLP, New York, New York, Counsel for City of New Orleans Employees' Retirement System and Co–Lead Counsel for the Plaintiffs.

A. Gilchrist Sparks, III, Esquire, S. Mark Hurd, Esquire, Samuel T. Hirzel, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Counsel for American International Group, Inc.

Daniel J. Kramer, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Of Counsel for American International Group, Inc.

Stuart L. Shapiro, Esquire, Shapiro Formal Allen Sava & McPherson LLP,

New York, New York, Of Counsel for American International Group, Inc.

Kevin G. Abrams, Esquire, J. Travis Laster, Esquire, Eric D. Selden, Esquire, Abrams & Laster LLP, Wilmington, Delaware, Counsel for Defendant Maurice R. Greenberg.

Nicholas A. Gravante, Jr., Esquire, Robert J. Dwyer, Esquire, Amy L. Neuhardt, Esquire, Boies, Schiller & Flexner LLP, New York, New York; David Boies, Esquire, Boies, Schiller & Flexner LLP, Armonk, New York, Of Counsel for Defendant Maurice R. Greenberg.

Sean J. Bellew, Esquire, Cozen O'Connor, Wilmington, Delaware, Counsel for Defendants ACE Ltd., ACE USA, Inc., ACE INA Holdings, Inc. and Susan Rivera.

Stephen A. Cozen, Esquire, George M. Gowen, III, Esquire, Cozen O'Connor, Philadelphia, Pennsylvania; H. Lee Godfrey, Esquire, Neal S. Manne, Esquire, Johnny W. Carter, Esquire, Jeremy J. Brandon, Esquire, Susman Godfrey LLP, Houston, Texas, Of Counsel for Defendants ACE Ltd., ACE USA, Inc. and ACE INA Holdings, Inc.

Richard J.J. Scarola, Esquire, Alexander Zubatov, Esquire, Scarola Ellis LLP, New York, New York, Of Counsel for Defendant Susan Rivera.

Thad J. Bracegirdle, Esquire, Reed Smith LLP, Wilmington, Delaware, Counsel for Defendants Marsh & McLennan Companies, Inc., Marsh, Inc., Marsh USA Inc. and Marsh Placement Inc.

Gregory P. Joseph, Esquire, Douglas J. Pepe, Esquire, Sandra M. Lipsman, Esquire, Gregory P. Joseph Law Offices LLC, New York, New York, Of Counsel for Defendants Marsh & McLennan Companies, Inc., Marsh, Inc., Marsh USA Inc. and Marsh Placement Inc.

Henry E. Gallagher, Jr., Esquire, Ryan P. Newell, Esquire, Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware, Counsel for Defendant PricewaterhouseCoopers LLP.

Thomas G. Rafferty, Esquire, Antony L. Ryan, Esquire, Samira Shah, Esquire, Cravath, Swaine & Moore LLP, New York, New York, Of Counsel for Defendant PricewaterhouseCoopers LLP.

David A. Jenkins, Esquire, Smith Katzenstein Furlow LLP, Wilmington, Delaware, Counsel for Defendants General Re Corporation and General Reinsurance Corporation.

George M. Garvey, Esquire, Fred A. Rowley, Jr., Esquire, Lika C. Miyake, Esquire, Munger, Tolles & Olson LLP, Los Angeles, California, Of Counsel for Defendants General Re Corporation and General Reinsurance Corporation.

Jeffrey M. Weiner, Esquire, Law Offices of Jeffrey M. Weiner, P.A., Wilmington, Delaware, Counsel for Defendant Robert D. Graham.

Alan Vinegrad, Esquire, Douglas B. Bloom, Esquire, Covington & Burling LLP, New York, New York, Of Counsel for Defendant Robert D. Graham.

Francis J. Trzuskowski, Esquire, John A. Elzufon, Esquire, Elzufon Austin Reardon Tarlov & Mondell, P.A., Bear, Delaware, Counsel for Defendant Richard Napier.

Frank J. Silvestri, Jr., Esquire, Janna D. Eastwood, Esquire, Levvett Rockwood, P.C., Westport, Connecticut, Of Counsel for Defendant Richard Napier.

Sean T. O'Kelly, Esquire, Cross & Simon LLC, Wilmington, Delaware, Counsel for Defendants Christopher P. Garand, William Gilman and Edward J. McNenney.

Richard L. Spinogatti, Esquire, William C. Komaroff, Esquire, John H. Snyder,

Esquire, Justin F. Heinrich, Esquire, Proskauer Rose LLP, New York, New York, Of Counsel for Defendants Christopher P. Garand and William Gilman.

Stephen C. Neal, Esquire, Scott D. Devereaux, Esquire, Kathleen H. Goodhart, Esquire, Cooley Godward LLP, Palo Alto, California, Of Counsel for Defendant Edward J. McNenney.

John C. Phillips, Jr., Esquire, David A. Bilson, Esquire, Phillips, Goldman & Spence, P.A., Wilmington, Delaware, Counsel for Defendant Elizabeth A. Monrad.

Scott M. Himes, Esquire, Edward J. Joyce, Esquire, Stillman, Friedman & Shechtman, P.C., New York, New York, Of Counsel for Defendant Elizabeth A. Monrad.

R. Montgomery Donaldson, Esquire, James G. McMillan, Esquire, Lisa Z. Brown, Esquire, Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, Delaware, Counsel for Defendant Ronald E. Ferguson.

Clifford H. Schoenberg, Esquire, Douglas I. Koff, Esquire, Joshua R. Weiss, Esquire, Joshua M. Bennett, Esquire, Cadwalader, Wickersham & Taft, LLP, New York, New York, Of Counsel for Defendant Ronald E. Ferguson.

Michael F. Bonkowski, Esquire, Cole Schotz Meisel Forman & Leonard, P.A., Wilmington, Delaware, Counsel for Defendant Patricia Abrams.

Marjorie E. Berman, Esquire, Krantz & Berman LLP, New York, New York, Of Counsel for Defendant Patricia Abrams.

Daniel B. Rath, Esquire, Rebecca L. Butcher, Esquire, James S. Green, Jr., Esquire, Landis Rath & Cobb LLP, Wilmington, Delaware, Counsel for Defendant Christian Milton.

Frederick P. Hafetz, Esquire, Tracy E. Sivitz, Esquire, Flora Tartakovsky, Esquire, Joshua R. Geller, Esquire, Hafetz & Necheles, New York, New York, Of Counsel for Defendant Christian Milton.

Daniel V. Folt, Esquire, Matt Neiderman, Esquire, Aimee M. Czachorowski, Esquire, Duane Morris LLP, Wilmington, Delaware, Counsel for Defendants Robert Stearns, Kathryn Winter, Todd Murphy, Regina Hatton, Nichole Michaels and Joshua Bewlay.

Nelson A. Boxer, Esquire, Kristin Ann Meister, Esquire, Robert Long, Esquire, Alston & Bird, LLP, Atlanta, Georgia, Of Counsel for Defendant Joshua Bewlay.

Ann McDonald, Esquire, Robinson & McDonald, LLP, New York, New York, Of Counsel for Defendant Robert Stearns.

David C. McBride, Esquire, Christian Douglas Wright, Esquire, Tammy L. Mercer, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Counsel for Defendants Karen Radke and Thomas R. Tizzio.

Michael S. Kim, Esquire, Steven W. Perlstein, Esquire, Jonathon D. Cogan, Esquire, Robert W. Henoch, Esquire, Kobre & Kim LLP, New York, New York, Of Counsel for Defendants Karen Radke and Thomas R. Tizzio.

Ian Connor Bifferato, Esquire, David W. deBruin, Esquire, Chad J. Toms, Esquire, Raj Srivatsan, Esquire, Bifferato Gentilotti LLC, Wilmington, Delaware, Counsel for Defendant Carlos Coello.

Nicholas M. De Feis, Esquire, Craig Trainor, Esquire, De Feis O'Connell & Rose, P.C., New York, New York, Of Counsel for Defendant Carlos Coello.

P. Clarkson Collins, Jr., Esquire, Thomas E. Hanson, Jr., Esquire, Katherine J. Neikirk, Esquire, Morris James LLP, Wil-

mington, Delaware, Counsel for Defendant Michael Castelli.

Charles I. Poret, Esquire, David A. Kotler, Esquire, Dechert LLP, New York, New York, Of Counsel for Defendant Michael Castelli.

Edward P. Welch, Esquire, Edward B. Micheletti, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Counsel for Defendant Edward E. Matthews.

John L. Gardiner, Esquire, Lauren E. Aguiar, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, Of Counsel for Defendant Edward E. Matthews.

Kurt M. Heyman, Esquire, Patricia L. Enerio, Esquire, Proctor Heyman LLP, Wilmington, Delaware, Counsel for Defendant Howard I. Smith.

Vincent A. Sama, Esquire, Eric M. Robinson, Esquire, Jeffrey R. Burke, Esquire, Catherine B. Schumacher, Esquire, Winston & Strawn LLP, New York, New York, Of Counsel for Defendant Howard I. Smith.

Michael A. Weidinger, Esquire, Pinckney, Harris & Weidinger, LLC, Wilmington, Delaware, Counsel for Defendant L. Michael Murphy.

Craig D. Singer, Esquire, Stephen D. Andrews, Esquire, Mary Beth Albright, Esquire, Williams & Connolly LLP, Washington, District of Columbia, Of Counsel for Defendant L. Michael Murphy.

Elizabeth A. Sloan, Esquire, Blank Rome LLP, Wilmington, Delaware, Counsel for Defendant Joseph Peiser.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

In the derivative portion of this action, stockholder plaintiffs (the "Stockholder Plaintiffs") seek to recover funds to make American International Group, Inc. whole for harm it suffered when it was revealed that the corporation's financial statements were materially misleading and overstated the value of the corporation by billions of dollars. According to the Stockholder Plaintiffs, the false financial statements did not come about inadvertently, but were the consequence of intentional misconduct by AIG's top managers.

Indeed, it does not overstate things to say that the Stockholder Plaintiffs allege that AIG embarked on widespread illegal misconduct at the direction and under the control of the Chairman of its board of directors and Chief Executive Officer, defendant Maurice R. Greenberg. According to the Stockholder Plaintiffs, Greenberg and a core "Inner Circle" directly oversaw all aspects of AIG's business and kept a close watch on their subordinates. Greenberg's Inner Circle was comprised of a small group of long-time AIG executives who Greenberg rewarded with very lucrative compensation packages. These executives oversaw almost all of AIG, including the parts that are implicated in the misconduct alleged by the Stockholder Plaintiffs. Among this Inner Circle were three defendants who feature prominently in this case: Howard I. Smith, who was an AIG director and its Chief Financial Officer; Edward E. Matthews, who served on AIG's board for almost thirty years and was Vice Chairman of Investments and Financial Services; and Thomas R. Tizzio, who was a director, Senior Vice Chairman of General Insurance, and a member of AIG's reinsurance security committee (together with Smith and Matthews, the "Inner Circle Defendants").

Most of the wrongdoing alleged in the First Amended Combined Complaint (the "Complaint") involved action by AIG insid-

ers to misstate AIG's financial performance in order to deceive investors into believing that AIG was more prosperous and secure than it really was. The single largest act of deception alleged involved a fraudulent $500 million reinsurance transaction in which various AIG insiders staged an elaborate artificial transaction with defendant Gen Re Corporation. Although AIG portrayed the transaction as providing Gen Re with reinsurance, in reality the transaction had no substance and was simply staged to make AIG's balance sheet look better. In other instances, AIG insiders allegedly used secret offshore subsidiaries to mask AIG losses, blatantly misstated accounts with no basis for their adjustments, failed to correct well-documented accounting problems in an AIG subsidiary, and hid AIG's involvement in controversial insurance policies that involved betting on when elderly people would die.

But, the complaint alleges, Greenberg and his Inner Circle were not content with merely hiding AIG's financial performance. Various insiders at AIG also caused the corporation to engage in schemes to avoid taxes by falsely claiming that workers' compensation policies were other types of insurance and by engaging in "covered calls" to recognize investment gains without paying capital gains taxes.

Similarly, various insiders allegedly involved AIG in conspiracies with other companies to rig markets. In both the municipal derivative and general insurance markets, AIG supposedly conspired with competitors and others to subvert supposedly competitive auctions by secretly preselecting the winners.

Finally, the Stockholder Plaintiffs allege that Greenberg and other defendants exploited their own familiarity with improper financial machinations by causing AIG to sell its "expertise" in balance sheet manipulation. AIG sold insurance policies that did not involve the actual transfer of insurable risk to other companies with the improper purpose of helping those companies report better financial results. AIG also created special purpose entities for other companies without observing the required accounting rules for the similarly improper purpose of helping those companies hide impaired assets that they did not want on their balance sheets.

Eventually, all of these schemes were uncovered. As a result, AIG suffered serious harm. The corporation was forced to restate years of financial statements, eventually reducing stockholder equity by $3.5 billion. And, AIG still faces litigation and regulatory proceedings on a number of fronts, an on-going process that has already required the corporation to pay over $1.6 billion in fines and other costs necessary to resolve proceedings against it.

When this case was first brought by the Stockholder Plaintiffs in 2004, it only involved some of the bid-rigging claims. As AIG and regulatory authorities disclosed more evidence of fraud and improper accounting practices at the company, the Stockholder Plaintiffs expanded their complaint to address the full scope of the revealed wrongdoing. In response, AIG's board of directors appointed a special litigation committee ("SLC") to investigate the claims. This litigation was stayed for eighteen months while the investigation was conducted. In the end, the SLC chose to take a fragmented approach. It decided to pursue claims against Greenberg and Smith on its own, seek the dismissal of certain other defendants, and take no position on the claims against the remaining defendants.

As a result, the pleading at issue on this motion is unusual. The First Amended Combined Complaint (the "Complaint") brings two sets of claims. Consistent with

the SLC's decision, AIG has joined the case as a direct plaintiff, and in two counts of the Complaint asserts breach of fiduciary duty and indemnification claims against Greenberg and Smith. In the same Complaint, the Stockholder Plaintiffs have brought derivative claims against two other defendants they regard as part of Greenberg's Inner Circle: Matthews and Tizzio. They also bring a claim against Greenberg arising out of a bid-rigging scheme in the municipal derivatives market. The Stockholder Plaintiffs have also sued several other former AIG officers and employees who they contend were complicitous in the wrongdoing at AIG and filed claims against entities that allegedly participated in the various frauds with AIG as well as twenty-two employees of those companies. Finally, the Stockholder Plaintiffs bring derivative claims for malpractice and breach of contract against PricewaterhouseCooper LLP ("PWC"), who served as AIG's auditor at all relevant times, and certified as accurate and GAAP-compliant AIG financial statements that later had to be revised downward by several billions of dollars.

Virtually every defendant has moved for dismissal. This decision addresses motions brought by defendants who were directors, officers, or employees of AIG, and by PWC.[1]

First, I address Greenberg, Matthews, and Tizzio's attempt to convince me that the Complaint does not state a viable claim against them. I grant that motion in very small part, but otherwise deny it. The small part is that the Stockholder Plaintiffs, despite the exculpatory provision authorized by § 102(b)(7) in AIG's certificate of incorporation, bring a breach of the duty of care claim seeking monetary damages from Tizzio, a former director protected by that provision. The due care claim cannot be a source of recovery here and must be dismissed.

The remainder of the claims against these defendants stand, however. These defendants quibble about whether the Complaint sufficiently pleads facts supportive of a non-exculpated claim of breach of fiduciary duty. But, a fair reading of the Complaint using the plaintiff-friendly lens required by Rule 12(b)(6) refutes that argument. The Complaint contains well-pled allegations of pervasive, diverse, and substantial financial fraud involving managers at the highest levels of AIG. As to Greenberg, the Complaint pleads repeated instances of his direct involvement in a variety of allegedly improper transactions. As to Tizzio, the Complaint is less detailed, but also pleads specific instances of his involvement in wrongdoing. Matthews has more of a point to his dismissal motion, as the Complaint has sparse references to his role in the alleged misconduct. But, the problem for Matthews and Tizzio is fundamental.

At this stage, I must draw all reasonable inferences in favor of the plaintiffs. Each of the Inner Circle Defendants—including Matthews, who was one of Greenberg's top

---

1. The defendants filed a bewildering array of opening briefs, which were not well coordinated in their treatment of identical arguments and involved over 400 total pages. The Stockholder Plaintiffs filed a single answering brief of 222 pages. The defendants did an improved job of coordinating on reply briefs, but still required over 300 pages of briefing. The Stockholder Plaintiffs were granted leave to file a sur-reply, which totaled some 103 pages in length. For efficiency's sake, the motions of the defendants who were not directors, officers, employees or retained agents of AIG (i.e., not its auditor, PWC) will be argued after this decision issues, which will ensure that those parties have an adequate chance to argue their motions and that both those parties and the Stockholder Plaintiffs can consider the implications of this decision for the remaining motions.

managers, had been awarded an enormous amount of stock by Greenberg, had supervisory authority over AIG's investments, and served on AIG's Finance and Executive Committees—was directly responsible for business units whose conduct was critical to the pervasive misconduct alleged in the Complaint. That misconduct was not isolated; it permeated AIG's way of doing business. The Stockholder Plaintiffs plead that the Inner Circle Defendants had personal knowledge of the wrongdoing, and the pled facts support that particular assertion. It may be that billions and billions of dollars in financial shenanigans involving diverse schemes that crossed business units at AIG occurred without the knowledge, approval, or support of Greenberg and his Inner Circle. A cosmic wrong may have been done to the Inner Circle Defendants, whose members were victimized by a large number of lower level employees who, despite good faith efforts at oversight and the use of internal controls by the Inner Circle Defendants, were able to avoid detection and engage in widespread financial fraud. For example, it may have been that Greenberg's long-time subordinate Matthews, who was in charge of AIG's investments, was kept in the dark by Greenberg or lower level employees when AIG invested hundreds of millions in off-shore subsidiaries and then entered into substanceless reinsurance contracts with them, or when AIG decided to invest in buying up elderly people's existing insurance policies while telling the public it was issuing new insurance policies. At this stage, however, a plausible inference arises that Greenberg and the Inner Circle Defendants themselves inspired and oversaw a business strategy premised in substantial part on the use of improper accounting and other techniques designed to make AIG appear more prosperous than it in fact was.

Furthermore, each of these defendants received compensation packages involving large amounts of equity, the value of which was dependent on AIG maintaining a high stock-trading price. And, each of these defendants, the Complaints suggests, was a financial sharpie, deeply sophisticated and experienced in intricate transactions. That is, of course, why Greenberg entrusted them with positions of confidence and authority at the very top of a corporation legendary for its generation of profits through complex insurance and financial endeavors. At this stage, a fair inference arises that Greenberg and the Inner Circle Defendants employed their expertise in illicit ways that ultimately resulted in billions of dollars of harm to AIG.

Moreover, the pleading of direct involvement by Greenberg and the Inner Circle Defendants in many of the specific alleged wrongs gives rise to a fair inference that the defendants knew that AIG's internal controls and compliance efforts were inadequate. That is, given that the Complaint pleads that Greenberg and the Inner Circle Defendants were able to implement several fraudulent schemes involving billions of dollars without detection by AIG's auditor, Audit Committee, or in-house lawyers, a fair inference arises that these defendants were conscious that the corporation had a deficient compliance structure. Indeed, a related inference arises that these defendants knew of improper conduct and failed to bring it to the attention of the full AIG board. For these and other reasons, I reject the motions of Greenberg, Matthews, and Tizzio to dismiss the breach of duty of loyalty claims brought against them. Likewise, because the Complaint pleads facts supportive of the inference that Matthews and Tizzio sold AIG stock during time periods when they were aware that the corporation's books and records were materially mis-

leading, I refuse to dismiss the fiduciary duty count based on those stock sales.

■ Relatedly, I reject an argument by Tizzio that the Stockholder Plaintiffs have not adequately alleged that he was part of the conspiracy to create the fake reinsurance transaction with Gen Re or that this transaction was not really fraudulent. Tizzio sat on the management committee that oversaw reinsurance transactions throughout AIG and oversaw the company that wrote the fake reinsurance policy. The Stockholder Plaintiffs have pled that Tizzio was part of a core group that was engaging in massive fraudulent conduct and that he chose not to do anything about various fraudulent transactions despite knowing their true nature. Combined with the fact that Tizzio oversaw the division engaged in the fraud, this supports an inference that Tizzio was involved in, or at the very least aware of, the improper Gen Re transaction, and did nothing to prevent it or to bring it to the attention of AIG's independent directors. I also reject Tizzio's argument that, because insiders at AIG knew that these transactions were phony, AIG was not defrauded as a matter of law because it is assumed to know everything that its agents do. Under Delaware law, where insiders have a disabling conflict that gives them a reason to hide information from the corporation's independent directors and stockholders, their knowledge is not imputed to the corporation for purposes of a suit seeking to hold the insiders who committed wrongdoing accountable for the harm they caused to the corporation. Accordingly, the fact that the Stockholder Plaintiffs have pled that the Gen Re transaction was ginned up by Greenberg and top-level AIG directors other than Tizzio does not immunize Tizzio from fraud liability for his role in that transaction.

Next, I address the argument made by defendants Greenberg, Matthews, Tizzio, and PWC that the claims against them should be dismissed because the Stockholder Plaintiffs did not make a demand on AIG's board of directors. Demand is not required where it would be futile. Here, the AIG board vested authority in the SLC to determine how AIG should address this litigation, including whether AIG should seek to prosecute the claims asserted by the Stockholder Plaintiffs itself or seek to have those claims dismissed. The SLC engaged in an investigation and made a decision to have AIG prosecute the claims against Greenberg and Smith and to have the claims against certain other defendants dismissed, but otherwise to take no position, positive or negative, regarding the remaining claims raised by the Stockholder Plaintiffs. Because the duly-empowered SLC made a conscious decision to remain neutral in this action, any further demand on the AIG board would be futile and is thus excused. As a result, to the extent that these defendants wish to have the Complaint dismissed for failure to state a claim, I find that they must prevail under the plaintiff-friendly Rule 12(b)(6) standard rather than the particularized pleading standard of Rule 23.1.

Afterwards, I address the motions of the defendants who were not directors of AIG, but held positions as officers or employees. Their alleged misconduct predates the amendment to 10 *Del. C.* § 3114 expanding that provision's reach to certain officers of Delaware corporations. Therefore, the Stockholder Plaintiffs must rely on Delaware's long-arm statute as a basis for this court to exercise personal jurisdiction over these defendants. To satisfy the long-arm statute, the Stockholder Plaintiffs argue that Delaware has personal jurisdiction over them under the conspiracy theory of jurisdiction because these defendants were engaged in a conspiracy to harm AIG, a

Delaware corporation. The problem for the Stockholder Plaintiffs is that there must be a statutory method for serving process on a defendant for a Delaware court to have personal jurisdiction over her. This means that for the conspiracy theory of jurisdiction to aid the Stockholder Plaintiffs, it must not only satisfy constitutional due process requirements, it must provide a basis for serving the defendants under the long-arm statute. The only basis for such jurisdiction that the Stockholder Plaintiffs have fairly argued is 10 *Del. C.* § 3104(c)(3), which creates jurisdiction over a person who, in person or through an agent, "[c]auses tortious injury in the State by an act or omission in this state."[2] The conspiracy theory of jurisdiction has often been used in concert with § 3104(c)(3) to impute one conspirator's tortious act in Delaware to the other co-conspirators. But, despite filing a 211–page Complaint, the Stockholder Plaintiffs fail to plead that any wrongful act occurred in Delaware. Given that failure, § 3104(c)(3) does not provide a basis for personal jurisdiction over the defendants who were not directors of AIG and the claims against them must be dismissed without prejudice.

Finally, I address PWC's motion to dismiss. Although PWC's duties as auditor affect AIG's internal affairs, the internal affairs doctrine is not directly invoked by the claims against PWC, and thus I must use the Restatement's "most significant relationship" test to determine what law applies to the claims against PWC. Because AIG is headquartered in New York

and PWC's allegedly wrongful conduct occurred in New York, the Restatement considers New York to have the most significant relationship to the claims against PWC, and thus I must apply New York law. This choice of law question is critical because, unlike what may be the case under Delaware law, New York law immunizes an auditor's breach of its professional duty of care where it fails to discover a fraud committed by a corporation's top insiders. As a result, despite the fact that the Stockholder Plaintiffs have pled facts suggesting that PWC did not live up to its responsibilities, New York law immunizes PWC from suit, and thus I must dismiss the claims against it.

## II. *Factual Background*

In accordance with the standards applicable on a motion to dismiss, I have assumed the truth of the plaintiffs' allegations and have granted the plaintiffs the benefit of all reasonable inferences.[3] The facts I outline have been drawn entirely from the operative Complaint and the various AIG securities filings which the Stockholder Plaintiffs have explicitly incorporated into that Complaint.[4]

The Complaint is lengthy and alleges that Greenberg, his Inner Circle, and other AIG employees engaged in a diverse array of financial and transactional wrongdoing. Most of the misconduct was aimed at concealing AIG's actual financial information from the market, so that investors would believe that AIG was in better financial health than it actually was. But,

2. 10 *Del. C.* § 3104(c)(3)

3. *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del.2001) ("[T]he plaintiff is entitled to all reasonable inferences that logically flow from the face of the complaint.").

4. *See* First Amended Combined Complaint ("Compl.") at 20 n. 4 ("Each of [AIG's] Form

10–K, 10–Q and Schedules 14A for the years 1996 through 2005, inclusive, are incorporated by reference herein. AIG's March 30, 2005 and May 1, 2005 press releases are also incorporated by reference herein."). AIG's 10–Ks are referenced throughout as "AIG —— Annual Report."

the Stockholder Plaintiffs also claim that the defendants caused AIG to engage in schemes to avoid paying taxes, to rig markets so that AIG did not have to compete with other firms, and to market illegal products designed to help other companies conceal their financial performance. All of these schemes were eventually uncovered, and, as a result of the plots, AIG suffered substantial harm and continues to be the subject of several pending legal actions. The Stockholder Plaintiffs allege that, as a consequence of the wrongful conduct challenged in the Complaint, AIG has had to restate its shareholder equity by $3.5 billion, pay another $1.6 billion to settle investigations by both the State of New York and the federal government, and spend millions of dollars on investigations to uncover and defend cases relating to proceedings involving the various machinations the Stockholder Plaintiffs describe. They also allege a range of continuing investigations and lawsuits that may uncover more fraud or expose AIG to additional liability for the schemes that have been uncovered.

## A. *Parties*

As explained below, this action has two separate groups of plaintiffs: (1) AIG suing on its own behalf; and (2) the Stockholder Plaintiffs suing derivatively on AIG's behalf.[5]

Plaintiff and nominal defendant AIG is a Delaware corporation with its primary executive office in New York. Through its subsidiaries, AIG engages in insurance, insurance-related, and finance businesses in over 130 countries.[6]

The Stockholder Plaintiffs have sued a large number of defendants. I describe here only the defendants relevant to this motion. For the sake of clarity, it is useful to group the defendants. The first group, which I have termed the Inner Circle Defendants, consists of defendant Greenberg and those of the defendants who were AIG directors and that the plaintiffs allege were within Greenberg's Inner Circle of trusted, top-level subordinates. The second group consists of those defendants who were officers or employees of AIG but did not serve on AIG's board of directors, who I will refer to as the "Employee Defendants." The final relevant defendant is PWC, which is a Delaware limited liability partnership of certified public accountants and related professionals. At all times pertinent to this litigation, PWC was AIG's auditor and principal accounting firm.[7]

Before discussing the specific illegal schemes alleged in the Complaint, I will discuss more about the Inner Circle Defendants, because the positions, incentives, and scope of influence those Defendants had are important to the resolution of their motions to dismiss the claims against them.

While the alleged fraud was going on at AIG, the company was overseen by Maurice Greenberg, who had been AIG's CEO since 1968 and the Chairman of AIG's board of directors since 1969. But, according to the Stockholder Plaintiffs, Greenberg's domination of AIG exceeded even what one would expect of a long-time CEO. Not only did Greenberg run the company, he allegedly knew everything

---

**5.** The Stockholder Plaintiffs are the Teachers' Retirement System of Louisiana, the City of New Orleans Employees' Retirement System, John Paul Fulco f/b/o Lucia Forastiere Irrevocable June Forastiere Backe Children's Trust, Paula Rosen, Thomas McAdam, and Bruce G. Murphy.

**6.** Compl. ¶ 8.

**7.** Compl. ¶¶ 174–75.

that went on within it.[8] As a former AIG executive put it, "[i]f a twig snaps in a Chinese forest, Maurice Greenberg hears it."[9] His domination even extended to the board that was supposed to be overseeing Greenberg and the rest of AIG's management. AIG's directors were allegedly so in Greenberg's thrall that they avoided asking questions around him lest they seem ignorant.[10] In fact, when an AIG director proposed that AIG investigate a conflict of interest of Greenberg's, Greenberg allegedly ended the discussion by saying "[t]hat would be stupid!"[11]

Greenberg's total control of the massive enterprise that is AIG was allegedly effectuated, at least in part, through Starr International Company, Inc. ("SICO") and C.V. Starr & Co., Inc. ("Starr"), two vehicles which owned huge amount of AIG stock and which Greenberg used to reward those who were loyal to him.[12] By January 31, 2004, these two vehicles held 13.7% of AIG's common stock, holdings which, at the time, were worth billions.[13] Those who Greenberg deemed worthy were granted the right to buy into Starr or SICO. In this way, Greenberg could, at his sole discretion, award tens of million of dollars to members of his Inner Circle who stayed in his good graces. And if the chosen few did not remain loyal, and Greenberg re-moved the insider from AIG, the insider would allegedly forfeit the entirety of his holdings, at least in Starr.[14] Matthews, Tizzio, and Smith emerge from the Complaint as particularly lucky beneficiaries of Greenberg's fealty-generating largesse.

By January 2005, Tizzio, who had been an AIG officer since 1982, held 5.4% of Starr and 8.3% of SICO.[15] The Stockholder Plaintiffs estimate that his holdings in Starr alone had a liquidation value of $32 million.[16] In addition to sitting on AIG's board, where he was on the Executive Committee, Tizzio served as Senior Vice Chairman of General Insurance[17] and was on AIG's internal reinsurance security committee. These key positions gave Tizzio responsibility for some of the most critical parts of AIG. The General Insurance division, which is what I must assume, at this stage, that Tizzio oversaw as Senior Vice Chairman of General Insurance, reported over $5 billion in operating income in 2003.[18] The General Insurance division also contained AIG's Domestic Brokerage Group, as well as AIG subsidiaries National Union Fire Insurance of Pittsburgh, Pennsylvania ("National Union) and American Home Assurance Company ("American Home") all of which, as we shall see, engaged in major transac-

8. Compl. ¶ 583.

9. Compl. ¶ 583 (modification in original).

10. Compl. ¶ 585.

11. Compl. ¶ 585 (modification in original).

12. Compl. ¶ 69.

13. AIG 2003 Annual Report at 1.

14. *See* Compl. ¶ 588.

15. Compl. ¶¶ 112–13.

16. Compl. ¶ 113.

17. In the case of both Tizzio and Matthews, the Shareholder Plaintiffs plead their job titles but not the extent of their responsibility. Specifically, they were Senior Vice Chairman of General Insurance and Vice Chairman of Investments and Financial Services respectively. Although AIG's 10–Ks do not clarify their responsibilities, they do break down AIG's operations into subdivisions including "General Insurance" and "Financial Services." In line with the plaintiff-friendly standard of Rule 12(b)(6), I have assumed that Tizzio and Matthews were responsible for those divisions respectively.

18. AIG 2002 Annual Report at 2.

tions infected with deceit.[19] When Tizzio left AIG's board of directors in 2003 he was made an "Honorary Director."

Matthews, who in addition to being an AIG officer, had been on AIG's board of directors since 1973, retired in 2003 holding 9.8% of Starr and 8.3% of SICO.[20] Although the Stockholder Plaintiffs do not estimate the value of these holdings, it is a reasonable inference that, based on the value assessed to Tizzio's somewhat smaller stakes, these had a liquidation value of over $50 million. Matthews was also on the Finance and Executive Committees of the AIG board. And before retiring in 2002, Matthews was Vice Chairman of Investments and Financial Services, a position that put him in charge of AIG Financial Products Corporation, another subsidiary that was allegedly involved in substantial wrongdoing.

Similarly, Smith, who is only being sued directly, was a director from 1997 to 2005 and served on the Finance and Executive Committees. He also held various sensitive positions within AIG, including Chief Administrative Officer, Chief Financial Officer, and Executive Vice President. And, like Matthews and Tizzio, he was handsomely rewarded for his fealty. He eventually owned 8.3% of SICO and 8.6% of Starr.[21]

Having discussed the positions of power Greenberg and the Inner Circle Defendants occupied at AIG, I now summarize the various wrongful schemes alleged in the Complaint. Although the Stockholder Plaintiffs provide detailed allegations about the illegal transactions and schemes that proliferated at AIG, they are not able to tie all of the defendants directly with specific facts to all of the schemes. In some instances, the Stockholder Plaintiffs

plead that Greenberg, Matthews, Tizzio, or Smith received memoranda describing the transactions, or even inspired the transactions. But in others, the Complaint only outlines the misconduct that occurred, or pleads the involvement of other members of Greenberg's Inner Circle. But, as discussed above, this is a motion to dismiss, and thus I must grant the Stockholder Plaintiffs the benefit of all reasonable inferences. Even the transactions that cannot be tied to specific defendants support the inference that, given the pervasiveness of the fraud, Greenberg and his Inner Circle knew that AIG was engaging in illegal conduct.

### B. *The Schemes*

The Complaint pleads that the members of Greenberg's Inner Circle caused AIG to engage in a diverse array of complex transactions that were, at bottom, deceptive. For simplicity's sake, one can distill these down to four essential types of alleged fraudulent schemes involving the following conduct:

- transactions designed to hide AIG's true financial situation;
- illegal schemes to avoid taxes;
- selling illegal financial products to other companies; and
- schemes to rig markets.

### 1. *Transactions Designed To Hide AIG's True Financial Situation*

### a. *Alleged Fraudulent Transaction With Gen Re To Overstate Loss Reserves*

The largest single fraudulent transaction alleged in the Complaint was motivated by a desire to improve AIG's loss reserves

---

**19.** *Id.* at 1.

**20.** Compl. ¶ 111.

**21.** Compl. ¶ 588

and make the company appear to be in sounder shape than it was. That $500 million transaction was entered into with defendant Gen Re Corporation, a subsidiary of Berkshire Hathaway Inc. As described by the Stockholder Plaintiffs, this transaction was a phony reinsurance contract. National Union, a subsidiary in defendant Tizzio's sphere of oversight,[22] purported to sell reinsurance to Gen Re but immediately paid all of the premiums it collected right back to Gen Re as a payout on the policy (the "Gen Re Transaction"). The result was that AIG was able to report increases in its loss reserves and claim the amount of premiums it received as income when no actual transfer of insurable risk had occurred. The only "real" part of the Gen Re Transaction was a $10 million fee that AIG allegedly paid Gen Re to go along with the scheme.

The Stockholder Plaintiffs allege that this scheme arose in response to stock market analyst commentary about AIG in late 2000. On October 26, 2000, AIG issued its earnings report for the third quarter of 2000 which stated that general insurance reserves had fallen by $59 million.[23] This drew what the Stockholder Plaintiffs characterize as "sharp criticism," and allegedly led to a 6% decline in the value of AIG stock.[24] Concerned about this criticism, Greenberg conceived of and negotiated a transaction with defendant Gen Re that would make it appear as if AIG had increased its loss reserves.[25]

As completed, Gen Re paid National Union $500 million to assume the risk from certain insurance policies that Gen Re had on its books. But, allegedly both Gen Re and key personnel at AIG, including Greenberg and Tizzio, understood that this would be a reinsurance transaction in name only.[26] Greenberg and Tizzio also allegedly knew that AIG would, upon transacting with Gen Re, almost immediately have to pay out the same $500 million face value on the policy. The defendants involved in this transaction also arranged for AIG to pay Gen Re a $10 million fee for being the counterparty to this transaction, the only purpose of which was financial manipulation. The Stockholder Plaintiffs also allege that various defendants at AIG and Gen Re worked together to create a false paper trail that would make it look like the transaction was a genuine sale of reinsurance by AIG to Gen Re.[27]

These efforts at concealment eventually failed, and AIG was forced to admit in its 2004 10–K that the Gen Re Transaction had been improperly accounted for on the company's books.[28] To correct the material misstatement, AIG had to reduce its premiums and net loss reserves by $250 million and increase its reported liabilities by $245 million.[29] On May 26, 2005 the New York Attorney General filed a complaint against Greenberg and Smith relating to, among other accounting issues, the Gen Re Transaction. Regulatory proceedings of various kinds ensued against AIG and Gen Re officers and employees. The U.S. Government eventually secured a guilty verdict against AIG's Vice President

---

22. AIG 2002 Annual Report at 1.

23. Insurance reserves are the money that an insurer like AIG sets aside to cover insurance claims. The larger the reserves, the more likely that an insurer will be able to cover any claims.

24. Compl. ¶ 196.

25. Compl. ¶ 196–198.

26. Compl. ¶¶ 197, 259.

27. *See* Compl. ¶¶ 224–30.

28. Compl. ¶ 270.

29. Compl. ¶ 271.

for Reinsurance, defendant Christian M. Milton, as well as various Gen Re employees. A variety of proceedings against Greenberg and Smith related to Gen Re remain pending.[30]

### b. *Various AIG Officers Encourage AIG Employees To Misstate Reserves*

The Stockholder Plaintiffs also allege that in 2000 and 2001, AIG's senior management took a very direct route to making the company look better by simply altering AIG's consolidated financial statements to reflect the image AIG wanted to portray (the "Topside Adjustments"). The Topside Adjustments occurred at the highest levels of AIG. Smith, AIG's CFO, would meet with other top-level AIG executives. At these meetings, Smith allegedly told the other participants what he would like a number in AIG's financials to look like.[31] The internal financial staff would then monkey with the books to meet Smith's desired targets. For example, capital gains would be reclassified as net income or income would be "smoothed."[32] In this way, the Topside Adjustments overstated AIG's loss reserves, increasing their reported value by $32 million in the fourth quarter of 2000, and by $70 million in the first quarter of 2001.[33]

As with the Gen Re Transaction, AIG was not able to overstate its financial statements indefinitely. According to the Stockholder Plaintiffs, "AIG has since acknowledged that it was unable to find any documentation or supporting analysis for the [Topside Adjustments]."[34] In late 2004, AIG reduced consolidated shareholders' equity by $206 million to reverse the misstatements caused by the Topside Adjustments.[35]

### c. *Improperly Disclosed Transactions With Off–Balance Sheet Affiliates Of AIG*

The Stockholder Plaintiffs also allege that the defendants caused AIG to engage in transactions that it represented to the investing public were arms-length transactions between AIG and entities that AIG did not own or control, when, in fact, AIG controlled these contractual counterparties (the "Secret Subsidiary Transactions"). Specifically, the Stockholder Plaintiffs allege that AIG secretly controlled Capco Reinsurance Company, Union Excess Reinsurance Company, Ltd., Coral Reinsurance Co., Astral Reinsurance Co., and Richmond Insurance Company Ltd., but did not disclose its control and ownership stake in these companies. Using the fact that the outside world believed the four companies to be third-parties, Smith and other officers, with Greenberg and Tizzio's knowledge, caused AIG to enter into transactions with these entities on a false basis as a method of transforming operating losses that AIG had suffered in its insurance business into investment losses, which the market would perceive as less value-threatening.[36] But, in reality these were AIG affiliates, and had AIG's interest in these companies been properly reported, the results of these affiliates would have been consolidated into AIG's financials. In other words, if properly accounted for, these were transactions between AIG and itself that involved no transfer of

---

30. Compl. ¶ 274.

31. Compl. ¶ 281.

32. Compl. ¶ 284.

33. Compl. ¶¶ 278–83.

34. Compl. ¶ 283.

35. Compl. ¶ 286.

36. Compl. ¶¶ 295, 300, 486.

real economic risk and no accounting effect.

By way of example, the Stockholder Plaintiffs offer AIG's $210 million "insurance" transaction with Capco in 2000 and 2001. According to the Stockholder Plaintiffs, that transaction was inspired by a $210 million loss from insurance operations at National Union, an AIG subsidiary in Tizzio's division, that AIG's top management was not keen to report.[37] To avoid reporting it, Greenberg, Smith, and Tizzio developed a complicated fake transaction with Capco, a Barbados-domiciled reinsurance company that was originally a subsidiary of Western General Insurance Ltd.[38]

The first step in this scheme was to take control of Capco secretly. This had to be done indirectly because, under New York law, if AIG owned more than 10% of Capco's voting stock, it would be presumed to control Capco.[39] To accomplish this indirect acquisition of control, Western General emptied Capco of most of its business.[40] AIG then invested $170 million in non-voting stock and had its Swiss bank find three non-U.S. investors who AIG loaned $19 million to buy voting stock in Capco. But, these were loans in name only. When AIG made the loans it knew that they were unlikely to ever be paid back.[41] In this way AIG made it look like Capco was an independent company, when AIG was really Capco's only investor.

Then, having assumed control of Capco without disclosing that fact to anyone, AIG transferred insurance operation losses to Capco. AIG did this through the same type of sham reinsurance transaction that

AIG used with Gen Re. But, this time AIG did not have to compensate its partner, because in reality it was dealing with itself. Capco reinsured $210 million dollars of National Union auto warranty losses for only $20 million in premiums. From the beginning, AIG never expected Capco to make money on the transaction. In fact, the entire point was for Capco to recognize the loss instead of National Union. This loss did carry through to AIG as an investment loss on its holdings in Capco, but the Stockholder Plaintiffs allege that an investment loss was "far less noticeable," and thus less important to AIG, than the insurance business operating loss AIG would have otherwise recognized.[42]

In 1999 and 2000, AIG also allegedly used two fraudulent transactions with Union Excess to conceal losses in AIG's Brazilian underwriting business. The subjects of these transactions were sizable losses at Unibanco Seuros, AIG's Brazilian life insurance business.[43] These negative results should have shown up in the financial results of American Reinsurance, AIG's Bermuda subsidiary. Rather than admit to those losses, the Stockholder Plaintiffs allege that Greenberg and Smith caused AIG to engage in two sham reinsurance contracts. In the first such transaction, Union Excess, an off-balance sheet AIG entity, reinsured American Reinsurance's known losses in Nan Shan Life Insurance Company, Ltd., an AIG company located in Taiwan whose results were also reflected in American Reinsurance's balance sheet.

37. Compl. ¶ 292.

38. Compl. ¶ 296.

39. N.Y. Ins. Law. § 1501(a)(2) (2006).

40. Compl. ¶ 298.

41. Compl. ¶ 289. The investors allegedly received $33,000 per year and another $33,000

upon the termination of their investment in exchange for their involvement. Compl. ¶ 303.

42. Compl. ¶ 308.

43. Compl. ¶ 319.

American Reinsurance then entered into a swap transaction with Union Excess. This transferred the losses back to American Reinsurance, but as investment losses.[44] In the first of these transactions, undertaken in early 1999, AIG allegedly transformed $34 million in insurance underwriting losses into $33 million in investment losses and $1 million in premiums.[45] In a second such transaction in 2000, AIG allegedly eliminated the need to recognize $30 million in insurance underwriting losses, instead recognizing a $28 million investment loss and paying $2 million as a premium.[46]

The Stockholder Plaintiffs also allege that while the Inner Circle was in charge of AIG, the company entered into similar transactions with Coral Re, Richmond, and Astral. Although the individual details differ, the essence was the same: AIG engaged in reinsurance transactions with companies it secretly controlled in order to mask its financial performance.[47] In restatements relating to Richmond and Coral Re alone, AIG had to reduce shareholders' equity by over $1 billion.[48]

The Stockholder Plaintiffs allege not only that Greenberg and Smith inspired these transactions, but that Tizzio helped implement Capco and received reports on its status.[49]

### d. *AIG Allegedly Masked Its Involvement In The Sale Of Controversial Insurance Products*

Greenberg and Smith also allegedly caused AIG to engage in wrongdoing related to controversial "life settlement" investments. Life settlement transactions involve buying life insurance policies that have already been made. After acquiring the policy, the purchaser keeps making premium payments and is entitled to receive the death benefits upon the original policy holder's death. Most commonly, these investments are made by buying policies from sick or elderly people in a bet that the original holder will die soon enough that the purchase will pay off.[50] Although not illegal, these policies are controversial because they involve a ghoulish bet that sick and elderly people will die sooner rather than later. Greenberg allegedly wanted to make profits from this type of transaction while concealing from the public that AIG was engaging in it. And, AIG's managers did not like what flowed from proper accounting treatment of the transactions, which was the possibility that AIG would have to carry the investments at a loss on its books.[51]

To get around both problems, Greenberg, Smith, Tizzio, and other high-level AIG executives designed a complex scheme whereby Coventry Settlement Trust ("Coventry"), a separate entity, would invest in these policies for AIG.[52] Although AIG set up Coventry, it was owned by Hanover Life Reassurance (Ireland) Limited, which was not part of AIG.

Starting in 2001, American Home Assurance Corporation, an AIG affiliate, lent Coventry funds which it used to take out fake insurance policies from American In-

---

44. Compl. ¶ 322.

45. Compl. ¶ 325.

46. Compl. ¶ 332.

47. Compl. ¶ 483.

48. Compl. ¶¶ 490, 500.

49. Compl. ¶ 300, 308.

50. Compl. ¶ 461.

51. Compl. ¶ 463.

52. Compl. ¶¶ 465–66.

ternational Specialty Lines Insurance Co. ("Specialty Lines"), an Alaskan subsidiary of AIG. Coventry then filed claims on the policies equal to the value of its premiums and used those funds to purchase life settlements. When death benefits were collected, Coventry paid them to Specialty Lines as additional premiums.[53] Earnings from these controversial policies thus showed up as normal underwriting income. AIG did not have to carry the policies as investments on its books or admit its involvement in this controversial market.

When the Alaska Department of Insurance learned of Specialty Lines' activities, it demanded that Specialty Lines stop them. The policies were then moved to AIG's now-familiar Bermuda subsidiary, American Reinsurance. But, that shift only deferred the inevitable. Eventually, AIG had to admit that its scheme violated GAAP and, as a result, decreased its stockholders' equity by almost $400 million.[54]

The Stockholder Plaintiffs allege that Smith and Tizzio knew about these transactions and the structure built to hide them.[55]

### e. Improper Accounting In The Domestic Brokerage Group

The Stockholder Plaintiffs also allege that Greenberg, Tizzio, and Smith failed to correct a number of accounting errors in AIG's Domestic Brokerage Group. The Domestic Brokerage Group was a key part of AIG's business and was responsible for all of AIG's general insurance operations in the United States, generating over half of AIG's net premiums in 2001.[56] Problems in the Domestic Brokerage would affect all of AIG. But, as it became clear that the Domestic Brokerage Group had major accounting problems that were overstating AIG's reserves, Tizzio, Greenberg, and Smith did not take meaningful action to correct them.[57]

The specific errors were both long lived and varied. Some of the issues at AIG's Domestic Brokerage Group dated back to the early 1990s, and the problems ranged from the mundane, like uncollectable receivables, to more troubling problems, like accounts that did not reconcile with each other.[58] AIG officers allegedly hid these deficiencies and then worked to slowly remedy them instead of quickly and accurately correcting the accounting.

Of the various issues in the Domestic Brokerage Group, the Stockholder Plaintiffs focus primarily on what was known as the "AIGRM Legacy." This matter involved discrepancies in accounts related to AIG's risk management unit. The Stockholder Plaintiffs allege that various officers, including defendant Tizzio, who was ultimately in charge of the Domestic Brokerage Group, knew about these problems as early as 1998 [59] and that Smith and Greenberg were involved in these issues by late 2003.[60]

Despite possessing information that AIG was not properly accounting for a range of transactions, Tizzio, Greenberg, and Smith allegedly did not do anything to correct the misstated accounts or increase AIG's reserves to deal with the problem. Instead, the Stockholder Plaintiffs allege

---

53. Compl. ¶ 468.

54. Compl. ¶ 472–73.

55. Compl. ¶ 465.

56. AIG 2002 Annual Report at 3.

57. Compl. ¶¶ 525–529.

58. Compl. ¶ 521.

59. Compl. ¶ 522.

60. Compl. ¶ 526

that memoranda continued to circulate and, on occasion, officers would have certain amounts set aside as reserves or increase operating expenses to slowly adjust for the problems.[61] But, no effort was made to correct the substantial errors with alacrity and in full. Eventually, AIG was forced to admit that its failure to timely correct the misstated accounts in the Domestic Brokerage Group had caused its financial statements to be incorrect to the tune of $300 million, a hit to stockholders' equity that was recognized in May 2005.[62]

### 2. *Illegal Schemes To Avoid Taxes*

The Stockholder Plaintiffs also allege that the defendants caused AIG to engage in various frauds to avoid taxes.

### a. *Workers' Compensation Scheme Designed To Avoid Taxes*

The Stockholder Plaintiffs allege that unnamed senior executives and directors caused AIG to mask workers' compensation insurance as general or auto liability insurance in order to lower its tax bill (the "Workers' Compensation Scheme").[63] In New York and other states, workers' compensation policies are commonly subject to higher taxes than other types of insurance.[64] Workers compensation insurers must also put aside money into special assessment funds.[65] Both requirements cost insurers money and make workers' compensation policies more expensive to issue dollar-for-dollar than other types of policies. To avoid these costs, AIG pretended that portions of its workers' compensation policies were for general or auto

liability insurance. This avoided the higher taxes, at least for a time. Eventually, New York State and the federal government discovered the fraud and forced AIG to pay out over $400 million.[66]

Unlike many of the other alleged wrongful schemes, the Workers' Compensation Scheme allegedly drew concern from AIG legal staff well before the scheme came to public light. Apparently the mischaracterizations of policies stretched as far back as 1989, when the president of AIG Risk Management, Inc. prevented one of his Vice Presidents from stopping the practice.[67] In 1992, Mike Joye, who was AIG's General Counsel at the time, issued a memorandum to both Tizzio and Greenberg describing thirteen ways in which AIG's actions regarding workers' compensation policies were illegal.[68]

Joye also suggested corrective actions that AIG could take, including discharging the employees involved and making restitution. But according to the Stockholder Plaintiffs, Tizzio told Joye that AIG planned to take no corrective action.[69] The Stockholder Plaintiffs concede that AIG hired an outside law firm to follow up, but allege that Tizzio and the other top managers involved never caused AIG to come clean about its past practices and that AIG continued hide what it had done. It was only after government investigators called the question that AIG publicly disclosed the Workers Compensation Scheme. In February 2006, AIG had to announce that it was paying $344 million to settle

---

61. Compl. ¶¶ 525–30.

62. Compl. ¶ 531.

63. Compl. ¶ 333.

64. Compl. ¶ 333.

65. Compl. ¶ 333.

66. Compl. ¶¶ 59, 344.

67. Compl. ¶ 334.

68. Compl. ¶ 339.

69. Compl. ¶ 340.

legal actions brought by New York State.[70] It also had to pay a $100 million fine,[71] and, as of the filing of AIG's Form 10–Q in June 2007, other proceedings relating to the Workers' Compensation Scheme remained pending.[72]

### b. *AIG Uses "Covered Calls" To Recognize Gains Without Paying Capital Gains Taxes*

AIG also engaged in complicated financial transactions designed to recognize gains on its investments without having to pay capital gains taxes. Normally, a company does not recognize any gain on its assets until it sells the asset. But, when it sells the asset it must also pay taxes on the asset's appreciation. Although the specifics are not detailed, the Stockholder Plaintiffs allege that between 2001 and 2003 AIG sold call options on assets with unrealized appreciation and then used forward transactions and swaps to reacquire the assets that it had sold using the call options. By this allegedly unlawful tactic, AIG allegedly recognized the appreciation of its assets on its books but did not pay capital gains taxes. Between 2001 and 2004, AIG used these complicated transactions to recognize improper investment income to the tune of $297 million. But, like the other frauds, this one was also discovered, and in May 2005 AIG reduced its previously reported investment income by $297 million.[73]

### 3. *Selling Illegal Financial Products To Other Companies*

The Stockholder Plaintiffs further allege that AIG officers and directors caused AIG to exploit its expertise in balance sheet manipulation by turning it into a saleable commodity. They had AIG develop and sell "income smoothing products" to other companies that allowed those companies to misstate their financial statements. These products involved sham insurance policies and fake third-parties.

The first type of product that AIG sold was simply a variant on the transaction with Gen Re. AIG underwrote carefully tailored insurance policies whose only purpose was to improve the appearance of the counterparty's own financial statements. As in the Gen Re Transaction, there was never a transfer of insurable risk in the genuine sense. Rather, AIG's counterparty was, from the get-go, expected to eventually file claims on the full amount of the policy, which AIG would in turn pay without asking questions.[74] The counterparty would then report the insurance proceeds as income, generating revenues to offset some or all of its losses.[75] AIG would continue charging a premium on the policy and by the time the policy was terminated, AIG would have recovered the full amount it paid out on the bogus claim plus a healthy fee for engaging in the sham.

In early 1999, AIG allegedly entered into such a sham insurance policy with Brightpoint Inc. Brightpoint had suffered a loss of $29 million, and rather than admit the loss to its stockholders, it chose to hide the loss through a fake policy with AIG's National Union subsidiary, which was in Tizzio's sphere of oversight as Senior Vice Chairman of General Insurance.[76] In appearance, Brightpoint took out a policy

---

70. Compl. ¶ 344.

71. Compl. ¶ 59.

72. Compl. ¶ 345.

73. Compl. ¶ 517.

74. Compl. ¶¶ 418–20.

75. Compl. ¶ 420.

76. Compl. ¶¶ 425–26; AIG 2002 Annual Report at 1.

from National Union, and then immediately submitted an $11.9 million claim.[77] Brightpoint reported the $11.9 million as an insurance receivable, providing a source of income to offset its losses.

But, this was an insurance policy in name only. Brightpoint and AIG had allegedly worked out in advance exactly how much Brightpoint would submit a claim for. And Brightpoint was to maintain the policy for three years, submitting "premiums" that were in reality payments on the money that AIG had advanced as a sham payout.[78] Using this scheme, Brightpoint reported an insurance receivable of $11.9 million.[79] For its part in the transaction, AIG received $15.3 million.[80] Like the other alleged frauds, this one eventually surfaced. In July 2000, the SEC began questioning the Brightpoint transaction, and AIG was served with a subpoena in November 2001.[81] By February 2002, AIG had refunded the excess money it received for structuring the fraudulent insurance policy.[82] The SEC also instituted an action against AIG, which was eventually settled for $10 million.[83]

The second type of income smoothing product involved a more complicated variation on the Secret Subsidiary Transactions. These income smoothing products were based on the use of special purpose entities ("SPEs") by AIG's clients to house problematic assets and avoid disclosing their performance. As long as one of these SPEs held an asset, a change in the asset's value would not carry through to the client's balance sheet. If the asset lost some or even most of its value, the client's balance sheet would be unaffected. But, if the value of the assets ever increased, the client could liquidate the SPE and recognize the appreciation on its books.

But, these structures only work legally if the SPE is considered to be a separate entity under GAAP. At the relevant time period for purposes of the sale of these products, an SPE had, at the very least, to have an outside investor that made an investment equal to 3% of the assets of the SPE to qualify as a separate entity that need not be consolidated.[84] AIG Financial Products, an AIG subsidiary under defendant Matthews' sphere of oversight as the head of Financial Services,[85] allegedly made a business of being the third-party that invested. But, AIG would immediately receive a "structuring fee" higher than the 3% it was supposedly putting at risk as an investment in the client's SPE.[86] AIG was thus investing with the other company's money, despite the fact that the entire point under GAAP was that AIG—as the outside investor—was supposed to have its own capital at risk. In addition, for accounting reasons, AIG would sell 30–year notes to the SPE in exchange for cash.

To help market these products, which AIG referred to as Contributed Guaranteed Alternative Investment Trust Securities ("C–GAITS"), AIG allegedly sought

77. Compl. ¶¶ 427–29.

78. Compl. ¶ 428.

79. Compl. ¶ 429.

80. Compl. ¶ 432. AIG also submitted a letter to Brightpoint's auditors representing there was only a possibility Brightpoint would recover under the policy, even though Brightpoint and AIG's agreement made Brightpoint's recovery a certainty. Compl. ¶ 428.

81. Compl. ¶ 430.

82. Compl. ¶ 433.

83. Compl. ¶ 436.

84. Compl. ¶ 438.

85. AIG 2002 Annual Report at 1.

86. Compl. ¶ 438.

the approval of an outside accounting firm.[87] The idea was to provide AIG with a letter it could show to potential clients to assure the clients that the C–GAITS were legal. But, the accounting firm told AIG that, as structured, there were problems with C–GAITS. Although it did not raise the issue that AIG was being paid more than it was investing, the accounting firm did raise a related issue. Because AIG would be issuing 30–year notes, it would immediately be getting cash from the SPE in exchange for those notes. The auditor worried that the cash might be deemed a payout. And, since AIG Financial Products only planned to invest the 3% minimum, if regulators thought AIG received any payout, no matter how small, AIG would not have a sufficient interest in the SPE, and thus the entire scheme would fail.[88] AIG's auditor recommended that AIG remedy this problem by increasing the investment in any C–GAITS SPE to 5%.[89] This would have kept AIG's investment in the SPE small, while also providing a cushion with respect to the minimum 3% required by GAAP in case the cash exchanged for the 30–year notes was considered a return on AIG's investment.

But, rather than taking even the small step of investing more money to make sure that the C–GAITS complied with GAAP, the problem was simply hidden. In its final opinion letter on the matter, the auditor, presumably at AIG's insistence, glazed over the problem by simply omitting who would be issuing the 30–year notes.[90] In this way, it could issue a clean bill of health without AIG even taking a minimal step to achieve GAAP compliance. And, AIG Financial Products continued to market the product with AIG-issued notes— that is, in the form that AIG had been warned might cause the entire SPE to fail GAAP requirements.

Although the SEC ultimately attacked the problem from a different perspective, AIG wound up paying over $100 million in fines because its investments in C–GAITS SPEs were deemed too small. At issue were three SPEs that AIG created for PNC Financial Services Group. The SPEs AIG sold PNC were designed so PNC could remove $762 million in faulty assets from its balance sheet. For its part, AIG received a $46 million fee.[91] In this instance, the specific problem of the 30–year notes was avoided because PNC, based on the counsel of its own auditors, decided to get another issuer for the 30–year notes.[92]

But, AIG's capital investment remained at 3% despite the fact that it had received more than that in fees. When the SEC investigated, it seized on this issue and argued that AIG never had a 3% investment because PNC had paid AIG more than that in fees and no AIG cash was ever at risk.[93] The United States Department of Justice also joined in the suit. In the end, AIG settled the suits, paying an $80 million penalty to the Department of Justice and $46 million to an SEC disgorgement fund.[94]

#### 4. AIG Schemes To Rig Markets

The Stockholder Plaintiffs also allege that Greenberg, Matthews, and Tizzio

---

87. Compl. ¶ 441. The Complaint does not identify the accounting firm.

88. Compl. ¶ 442.

89. Compl. ¶ 442.

90. Compl. ¶ 443.

91. Compl. ¶ 446.

92. Compl. ¶ 445.

93. Compl. ¶¶ 445, 449.

94. Compl. ¶ 456.

caused AIG to participate in bid-rigging conspiracies in two separate product markets.[95]

The essence of both alleged plots were false auctions. These created the appearance of a competitive bidding process in which AIG and other firms would submit bids. But, the relevant market maker would have allegedly predetermined who, as between AIG and its competitors, would offer the best deal and thus "win" the auction. Potential customers would think that they had engaged in a competitive bidding process providing them with a competitive rate when all that had really happened was a carefully choreographed play.

### a. AIG Participates In A Bid–Rigging Scheme With Marsh & McLennan Companies, Inc.

The primary form of bid-rigging involved an alleged scheme run by defendant Marsh & McLennan Companies, Inc., the world's largest provider of insurance brokerage and consulting services.[96] Starting in 1999, it was also run by Jeffrey Greenberg, who is defendant Maurice Greenberg's son.[97] On the surface, Marsh & McLennan's business model is simple. Companies pay Marsh & McLennan to locate the best deal available on insurance, a service for which Marsh & McLennan receives a percentage of its clients' premium payments.[98]

But, the Stockholder Plaintiffs allege that instead of locating the best deal available, Marsh & McLennan ran a rigged game. AIG and other insurers would pay Marsh & McLennan a certain amount of money in order to get Marsh & McLennan clients. Marsh & McLennan would then pre-select which insurer would insure which client, and the various insurers would submit bids that guaranteed that the pre-determined insurer would "win."

The process began with "Placement Service Agreements" and "Market Service Agreements" in which AIG and other insurers would pay "contingent commissions."[99] In reality, this was all euphemism for a pay-to-play scheme. By making these payments, AIG became a "preferred market," a status which gave it inside information and which allegedly also led to Marsh & McLennan virtually guaranteeing AIG that it would have the chance to sell certain policies.[100]

Marsh & McLennan could guarantee that AIG would receive policies because it was secretly manipulating the market. For example, the Stockholder Plaintiffs allege that another large insurance and reinsurance seller, defendant ACE, Ltd., was also allegedly involved in the conspiracy. According to the Complaint, Marsh & McLennan would tell AIG and ACE which bids each was to win. Whoever was to win was instructed to submit an "A Quote" and the pre-determined loser would then offer a "B Quote," which was designed to be less attractive to Marsh's client than the A Quote.[101] Marsh & McLennan's clients would then think that there had been an active bidding process that allowed them to find competitive offers.

When the bid-rigging conspiracy was uncovered, criminal prosecutions ensued and, already, former AIG employees and

---

95. Compl. ¶ 403.

96. Compl. ¶ 131.

97. Compl. ¶ 359

98. Compl. ¶ 347.

99. Compl. ¶ 349.

100. Compl. ¶ 350.

101. Compl. ¶ 362.

defendants Tateossian, Mohs, Radke, and Coello have pled guilty to criminal charges.[102] Of these defendants, at least Tateossian and Radke participated as employees of American Home, a subsidiary in the General Insurance operations that Tizzio was in charge of.[103] The Stockholder Plaintiffs allege that Greenberg, Matthews, Tizzio and Smith knew about this misconduct and did nothing.[104]

### b. *AIG Rigs Bids For Municipal Derivatives*

The Stockholder Plaintiffs also allege that Greenberg, Matthews, and Tizzio caused AIG, through its subsidiaries AIG Financial Products and SunAmerica, to participate in a scheme to manipulate the market for municipal derivatives (the "Municipal Derivatives Scheme").[105] Municipal derivatives are tax exempt entities in which governments invest proceeds from bond offerings until the cash is needed. To win these contracts, the counterparty will often guarantee a return, only making money if the funds outperform the guarantee. The municipalities believed that the brokers they used were generating competitive bids that would increase the returns the municipalities would receive. Instead, certain brokers allegedly conspired with AIG and others to rig bids.

As in the scheme orchestrated by Marsh & McLennan, AIG and its co-conspirators,[106] would choose who would win a contract and manipulate the process to make sure that the pre-selected winner would prevail. The only difference is that this was, allegedly, not as centrally orchestrated as the Marsh & McLennan scheme. The various providers allegedly communicated what were supposed to be secret terms, either directly or through brokers. The selected bidder would then go last, with full knowledge of the other bids and thus how high it could bid and still win the "auction." [107]

When the federal government learned of the Municipal Derivatives Scheme, it launched a series of investigations. AIG Financial Products and SunAmerica are currently both named as defendants in a civil complaint filed in New York which bears a threat of treble damages.[108]

Notably, AIG Financial Products was part of AIG's Financial Services operations and thus under Matthews' purview.[109]

### 5. *The Harm Allegedly Suffered By AIG As A Result Of The Improper Schemes Detailed In The Complaint*

In concrete monetary terms, the harm suffered by AIG as a result of the machinations outlined in the Complaint is huge. AIG has had to pay out over $1.6 billion so far in the form of fines and other payments to resolve proceedings.[110] Most prominently, it had to pay over $440 million to settle litigation related to the Workers' Compensation Scheme and $800 mil-

---

102. Compl. ¶¶ 381, 389.

103. Compl. ¶¶ 127,128.

104. Compl. ¶ 358.

105. Compl. ¶ 403.

106. The Complaint is vague about the other entities that participated in the Municipal Derivatives Scheme. But, it allegedly included at least Bank of America Corporation, CDR Financial Products, Investment Management Advisory Group, Inc., and Sound Capital Management, Inc. Compl. ¶¶ 406, 408.

107. Compl. ¶ 405.

108. Compl. ¶ 411.

109. American International Group, Inc., Annual Report (Form 10–K) at 1 (Mar. 31, 2003).

110. Compl. ¶ 574.

lion in disgorged profits and civil penalties related to the various fraudulent transactions.[111] In addition, AIG's financial statements had to be restated twice, reducing shareholders' equity by a total of $3.5 billion.

Nor do those numbers represent the total cost of the defendants' alleged malfeasance. Millions have been spent on legal fees, and AIG is still subject to multiple suits alleging violations of federal securities and antitrust law.

The Complaint suggests that current company management continues to be distracted by these problems, that AIG's credibility in the markets has been deeply damaged, and that out-of-pocket costs will continue to mount. By early 2009, of course, these problems may seem a trifle compared to the setbacks AIG suffered during the recent financial industry collapse and its need to accept a huge infusion of support—some $150 billion—from the U.S. government to restore its solvency and viability. But billions of dollars were lost, a substantial amount even given recent events in the capital markets.

### III. *Legal Analysis*

This decision deals with the motions to dismiss brought by Greenberg, the Inner Circle Defendants, the Employee Defendants, and AIG's auditor, PWC. These defendants have advanced a plethora of arguments.

For the benefit of clarity, I start with the arguments most dependent on the detailed factual allegations of the Complaint. By beginning with them first, they can be considered when those allegations are freshest in the reader's mind. Factual arguments of that kind have been advanced by several of the Inner Circle and Employee Defendants. But, I need only address those made by Inner Circle Defendants Matthews and Tizzio because, as we shall later see, this court does not have personal jurisdiction over the other defendants making those arguments.

After addressing the factually-based arguments for dismissal, I address the argument made by several of the defendants that this case should be dismissed because the Stockholder Plaintiffs failed to make a demand on AIG's board. Then, I address the contention of defendants Matthews and Tizzio that the claims against them are time-barred. From there, I turn to the argument of the Employee Defendants that this court cannot exercise personal jurisdiction over them.

Finally, I conclude this decision by addressing PWC's argument that, notwithstanding the existence of pled facts supporting a claim that PWC's negligent performance of its duties as AIG's auditor contributed to the ability of certain AIG directors, officers, and employees to implement and carry out for long periods of time unlawful schemes that resulted in material misstatements of AIG's books and records, PWC cannot be held liable to AIG. According to PWC, New York law governs the claims against it and immunizes a negligent auditor from liability if corporate insiders commit fraud, even if the auditor could have detected that fraud through the use of professionally adequate audit procedures.

### A. *The Stockholder Plaintiffs State A Claim That Matthews And Tizzio Violated Their Fiduciary Duties*

Two members of Greenberg's Inner Circle, defendants Matthews and Tizzio, seek to have the claims against them dismissed for failure to state a claim.[112] Matthews'

---

**111.** Compl. ¶¶ 59–60.

**112.** For both of these defendants, the counts include both a general breach of fiduciary

and Tizzio's motions on this subject have inspired a confusing serve and volley in which they and the Stockholder Plaintiffs debated nuances of corporate law, many of which are irrelevant to what, at this stage, is the basic issue: whether, under the plaintiff-friendly Rule 12(b)(6) standard, the Complaint states a claim that Matthews and Tizzio committed a non-exculpated breach of their fiduciary duties.[113]

The confusion here was no doubt inspired, in part, by the Stockholder Plaintiffs' mélange of arguments, which range from the proposition that Matthews and Tizzio knew of and helped inspire and implement the various wrongful schemes in the Complaint to the weaker assertion that they knowingly tolerated a lax system of internal controls that they knew were inadequate and easily bypassed.

But, the confusion also stems from Matthews' and Tizzio's attempt to focus on each scheme individually instead of on whether the Complaint as a whole supports a reasonable inference that they breached their fiduciary duties. To make this argument, Matthews and Tizzio focus on a weakness the Stockholder Plaintiffs have, which is the comparative absence of fact pleading about the specific involvement of Matthews (more particularly) and Tizzio (to a lesser degree) in the fraudulent financial schemes compared to the detailed fact pleading about the schemes themselves.

From this, Matthews and Tizzio try to escape the relevant inquiry at this stage—which is whether the Complaint pleads facts supporting a reasonable inference of a non-exculpated breach of fiduciary duty—and instead asks the separate question, whether the Complaint pleads facts tying Matthews and Tizzio to each and every one of the alleged schemes. This tactic, while understandable, ignores the relevant procedural standard, which, for reasons I later explain, is not the particularized pleading standard of Rule 23.1, and tries to evade a very plausible inference that I must draw in the Stockholder Plaintiffs' favor at this stage.

That inference is that those who engage in sophisticated forms of financial fraud do their best not to leave an obvious paper trail. Rather, consistent with their improper objectives, those at the top of such schemes try to conceal their roles and not leave marked paths leading to their doorsteps. And, although the Stockholder Plaintiffs have had access to a lot of written materials, they have obviously not had full discovery. Accordingly, the absence of detailed facts tying the Matthews and Tizzio to each fraud does not defeat the reasonable inference that Matthews and Tizzio were involved in these schemes, or at least knew about them. And, as we shall see, the Complaint pleads facts supporting this inference, which is all it must do to survive Matthews' and Tizzio's motions.

█ For present purposes, I need not burden the reader with the detailed analysis appropriate for a post-trial decision. Rather, it is enough to explain why the Complaint pleads facts supporting a fair

duty count and a separate count alleging breach of fiduciary duty solely in relation to the Municipal Derivatives Scheme.

113. The non-exculpated phrase is critical. For the life of me, I do not understand why the parties dueled over whether a due care claim was stated against Tizzio. The AIG certificate of incorporation has a § 102(b)(7) clause that insulates AIG's directors from lia-

bility for monetary damages for any harm flowing from their gross negligence. *See Malpiede v. Townson*, 780 A.2d 1075, 1095–96 (Del.2001) (affirming the dismissal of a duty of care claim where the corporation's charter had an exculpatory provision). The due care claim against Tizzio is dismissed on the basis of that clause.

inference that both Matthews and Tizzio: (1) knew of and helped Greenberg implement a diverse array of fraudulent schemes; and (2) knew that AIG's internal controls were inadequate.

I begin by briefly describing where Matthews and Tizzio were positioned within AIG's hierarchy, which was at the very top level and within Greenberg's Inner Circle.

Matthews was a long-serving Greenberg subordinate. He had been on AIG's board since 1973, and by the time he retired he held 9.8% of Starr and 8.3% of SICO. By 2005, Matthews' stake in Starr alone would have had a liquidation value of over $50 million. Matthews was also on the Executive Committee of AIG's board, which was made up of Greenberg, Matthews, Tizzio, and Frank J. Hoenemeyer, an executive at another insurance company.[114] Traditionally, the Executive Committee is the board committee comprised of the core managers of the organization, and AIG, it is fairly pled, was a traditional company that gave a very strong (if not steroidal) hand to management. Matthews was also Vice Chairman of Investments and Financial Services and served on the Finance Committee of the board. And he sat on the Credit Risk Committee that approved AIG Financial Products' sale of non-GAAP-compliant SPEs.

From these roles, one must, at this stage, infer that Matthews was a close confederate of Greenberg's, deeply sophisticated in financial investments, and, due to his lengthy experience with AIG's insurance operations, privy to and involved in financial investment strategies and product developments that were innovative, risky in nature, or sizable in scope.

Likewise, Tizzio was at the very top level at AIG and inferably a close confidante of Greenberg's. Tizzio had been a director since at least 1999, served on the Executive Committee, and was Senior Vice Chairman for General Insurance. Tizzio was also a member of the committee of senior AIG managers who oversaw the company's reinsurance operations. And, like Matthews, Tizzio was initiated by Greenberg into coveted ownership roles at Starr and SICO, where Tizzio owned 5.4% and 8.3% of these entities respectively. Tizzio's Starr position alone was worth over $32 million in 2005. Given these facts, it is inferable that Tizzio was one of Greenberg's confidantes, deeply sophisticated in insurance and reinvestment matters, and both privy to and personally involved in AIG insurance and reinsurance policies and practices that were innovative, risky in nature, or sizable in scope.

Ignoring their roles at AIG, Matthews and Tizzio attack the Complaint as deficient because several of the allegations against them simply refer to the "D & O Defendants," a term the Stockholder Plaintiffs define as including, in addition to Matthews and Tizzio, Employee Defendants Michael J. Castelli, Christian M. Milton, and L. Michael Murphy.[115] That is, it is not a huge group, but instead a focused one. Nonetheless, Matthews and Tizzio take issue with the allegations in the Complaint that use the term "D & O Defendants," arguing that they are deficient because, in some instances, the Complaint does not detail precisely how or why Mat-

114. AIG 2002 Annual Report at 1; Compl. ¶ 625.

115. In the current version of the Complaint, former AIG officers Vincent Cantwell, Joseph H. Umansky, and Robert P. Jacobson are also named as members of this inner circle. The Stockholders Plaintiffs, however, have since conceded that this court does not have personal jurisdiction over those former insiders, and thus I do not discuss them further. But, even with three more members, the D & O Defendants is still a small group.

thews and Tizzio were in the know in these instances. According to the Complaint, this group was involved in a range of wrongdoing, including: developing the Nan Shan transactions to hide underwriting losses,[116] failing to heed the advice of AIG's general counsel about the Workers' Compensation Scheme,[117] causing or allowing AIG to start selling fake insurance policies and SPEs to third-parties,[118] preventing AIG from properly disclosing the accounting problems with the C–GAITS,[119] and causing or allowing AIG to enter into phony reinsurance transactions with companies it secretly owned.[120]

Although these allegations are varied and far reaching, I, unlike Matthews and Tizzio, believe these allegations are supported by the pled facts. For starters, the Complaint is not laden with such accusations against the D & O Defendants as a group; these group accusations are used sparingly. Even more important, the Complaint pleads details about the fraudulent schemes that, when taken with the pled facts regarding Matthews' and Tizzio's roles at AIG, support the inference that they knew of and approved much of the wrongdoing.

As to Matthews, for example, it is relevant that several of the fraudulent schemes involved novel and substantial financial investments by AIG. The decision by AIG, for example, to purchase life settlement policies was a new business line that, although ghoulish, was at its core an investment, and thus something one would expect a Vice Chairman of *Investments* and Financial Services to be involved with. Ditto for AIG's use of option purchases in connection with "covered calls" to recognize capital gains without paying capital gains tax. Similarly, the schemes involving AIG's engagement in reinsurance transactions with its own controlled, offshore subsidiaries are ones suggestive of Matthews' direct involvement. It is implausible—at this stage—that Matthews did not know that AIG had investments totaling at least tens, if not hundreds or more, of millions of dollars in Union Excess, Richmond, and Astral. It is equally implausible that he was not aware that AIG invested $19 million through Swiss front-men, plus another $170 million directly, to gain control of Capco. Those kinds of investments were unlikely to get made without the knowledge of a top dog like Matthews, who was one of Greenberg's longest-serving and closest aides, a Vice Chairman of Investments and Financial Services and a member of AIG's Executive and Finance Committees.

And, of course, AIG's development and sale of the Orwellian-named "income smoothing" products directly implicates Matthews' roles as both a member of the Credit Risk Committee and the head of Financial Services, which contained the subsidiary that sold the SPEs. At this stage, one cannot infer that such innovative and risky products came to market through the spontaneous, unsupervised actions of lower-level AIG actors, that Greenberg cut trusted long-term confidantes like Matthews out of these loops, or even that Matthews did not know that AIG Financial Products had been specifically warned that its SPEs might not be GAAP-compliant. Rather, the more plausible inference is that Matthews got and stayed where he was precisely because Greenberg relied on his advice and expertise in these

116. Compl. ¶ 314–32.

117. Compl. ¶ 333–45.

118. Compl. ¶ 413–14.

119. Compl. ¶ 437–50.

120. Compl. ¶ 475–78.

critical areas. Similarly, given Matthews' sensitive position and overall power and influence within AIG, I cannot assume at this stage in the litigation that AIG Financial Products, a subsidiary under Matthews' supervision, took part in a scheme to collude with competitors in rigging markets without Matthews knowing about it.

The same type of analysis holds for Tizzio. Many of the fraudulent schemes detailed in the Complaint involved novel, risky, and substantial insurance and reinsurance transactions. As to the Workers' Compensation Scheme, for example, the Complaint pleads Tizzio's direct involvement in a discussion about how to address illegal conduct spotted by AIG's General Counsel. The Complaint fairly pleads that Tizzio was complicitous in covering these practices up and not remedying them in a swift and full manner. To my mind, in this procedural posture, one cannot attribute the decision to falsely characterize workers' compensation policies as other kinds of insurance in a tax dodge to underlings, or otherwise infer that this decision was made in a way that did not involve the managers in charge of AIG's insurance operations.[121] Similarly, the Complaint pleads that Tizzio knew that AIG's critical Domestic Brokerage Group was not accounting for a range of matters correctly. In fact, Tizzio allegedly prepared memos as early as 1997 detailing some of these problems.

Tizzio was also on the integral reinsurance security committee that AIG proclaimed "closely monitored" AIG's "utiliza-tion of reinsurance."[122] Thus, I cannot, on a motion to dismiss, assume that AIG engaged in very large sales of reinsurance to its own subsidiaries without Tizzio's knowledge. Taken together, the magnitude, frequency, and riskiness of these transactions suggests top-level involvement by Greenberg's Inner Circle, especially by the member of that circle who was Senior Vice Chairman of General Insurance and sat on AIG's critical reinsurance security committee. In fact, the Stockholder Plaintiffs plead that Tizzio was receiving memos updating him on the status of Capco. Given Tizzio's place on the AIG food chain, it is also improbable that Tizzio did not know that Capco, Union Excess, Richmond, and Astral were AIG affiliates.

And, in the case of the Gen Re Transaction, the inference that the Tizzio is asking me to improperly draw *against* the Stockholder Plaintiffs has an even weaker basis. Not only was Tizzio on the committee that was tasked with closely monitoring AIG's reinsurance operations, but the reinsurance was written by one of the subsidiaries in Tizzio's General Insurance division. The notion that this subsidiary made a phony $500 million sale of reinsurance without Tizzio knowing about it is not one that I can accept on a motion to dismiss.

Thus, for these and other similar reasons, I conclude that the Complaint pleads a claim that Tizzio breached his fiduciary duty of loyalty by being directly complicitous in various fraudulent schemes.

In addition, I find that the Complaint states a breach of loyalty claim against

---

121. The Stockholder Plaintiffs are coy about coming out and making this accusation, simply alleging that "senior executives and directors" engaged in the initial tax dodge. Compl. ¶ 333. But, at the very least, it is fairly pled that Tizzio was explicitly told by AIG's General Counsel that this conduct was illegal and that Tizzio and Greenberg chose to do nothing. And, when the problem finally came to light and AIG admitted the problem, it had to pay $344 million to settle the matter with the SEC, DOJ and New York Attorney General as well as a $100 million fine on top of that amount and still faces the other proceedings relating to the fraud.

122. AIG 2003 Annual Report at 4.

Matthews and Tizzio for knowingly tolerating inadequate internal controls and knowingly failing to monitor their subordinates' compliance with legal duties.[123] Again, this is an area in which the briefing was, for purposes of a motion to dismiss, needlessly intricate. And once again, the question here is a simple one: does the Complaint plead facts supporting an inference that Matthews and Tizzio knew that AIG's internal controls were broken?

Although Matthews and Tizzio once again try to deal with this question on a scheme-by-scheme analysis, the Stockholder Plaintiffs do not rest their monitoring, or *Caremark*,[124] claim on the failure of AIG's internal controls in one discrete instance of serious wrongdoing. If that were not true, and only one fraud occurred under their watch, Matthews and Tizzio would be well positioned—particularly in a case governed by Rule 23.1, rather than as here, by Rule 12(b)(6)—to argue that the Complaint needs more specifics about them individually to create a reasonable inference that they knew that AIG's internal control were broken.

But here? Really? The Complaint fairly supports the assertion that AIG's Inner Circle led a—and I use this term with knowledge of its strength—criminal organization. The diversity, pervasiveness, and materiality of the alleged financial wrongdoing at AIG is extraordinary. The proposition that Matthews and Tizzio, who the Complaint fairly alleges were directly knowledgeable of and involved in much of the wrongdoing, did not also know that AIG's internal controls were inadequate and too easily bypassed is not, for present purposes, an interpretation to ground a Rule 12(b)(6) dismissal order on. Indeed, for present purposes, it is inferable that even when Matthews and Tizzio were not directly complicitous in the wrongful schemes, they were aware of the schemes and knowingly failed to stop them. In that regard, I find it inferable that Matthews and Tizzio were aware of misconduct that should have been brought to the attention of AIG's independent directors (including the Audit Committee) but chose to conceal their knowledge, despite having a fiduciary duty to speak.

■ Although I fully recognize the difficulty of pleading a breach of the duty of loyalty based on a failure to monitor,[125] even under a Rule 12(b)(6) standard, the Stockholder Plaintiffs have done so here. Our Supreme Court has recognized that directors can be liable where they "consciously failed to monitor or oversee [the company's internal controls] thus disabling themselves from being informed of risks or problems requiring their attention."[126] And although satisfaction of this standard requires scienter, the pled facts support an inference that Matthews and Tizzio were "conscious of the fact that they were not doing their jobs."[127] Therefore, the fiduciary duty counts against Matthews and Tizzio stand.[128]

123. *See Stone v. Ritter*, 911 A.2d 362, 370 (Del.2006); *Guttman v. Huang*, 823 A.2d 492, 506 (Del.Ch.2003).

124. *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del.Ch.1996)

125. *See Caremark*, 698 A.2d at 967 (noting that a failure to monitor claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment"); *Guttman*, 823 A.2d at 506 ("Such a

test of liability—lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight—is quite high.").

126. *Stone*, 911 A.2d at 370.

127. *Guttman*, 823 A.2d at 506.

128. Greenberg makes a similar argument that the Stockholder Plaintiffs do not state a claim that he violated his fiduciary duties in relation

## B. The Plaintiffs State A Claim That Matthews And Tizzio Breached Their Fiduciary Duties By Trading On Their Insider Knowledge

 Matthews and Tizzio also argue that the separate breach of fiduciary duty claim against them premised on insider trading should be dismissed for failure to state a claim. The Stockholder Plaintiffs claim that Matthews and Tizzio breached their fiduciary duties by selling their stock based on material non-public information, specifically their knowledge of the pervasive fraud that was occurring at AIG.

 Under Delaware law, "directors who misuse company information to profit at the expense of innocent buyers of their stock should disgorge their profits." [129] A breach of fiduciary duty claim premised on insider trading, also known as a *Brophy*[130] claim, arises where "1) the corporate fiduciary possessed material, nonpublic compa-

ny information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." [131]

The Stockholder Plaintiffs claim that Matthews and Tizzio sold hundreds of thousands of shares of AIG stock between March 1999 and May 2004 in order to take advantage of the price AIG stock was trading at while the market was oblivious to the frauds the Stockholder Plaintiffs have alleged. Specifically at issue are sales by Matthews and Tizzio that totaled $21 million and $6 million respectively.[132] Of course, at the time these sales were occurring, AIG was allegedly permeated by the frauds described earlier, all of which, if known, would have made AIG a much less attractive investment.

By way of defense, Matthews and Tizzio both reiterate their argument that the Stockholder Plaintiffs have not created a

to the Municipal Derivatives Scheme. To do so, he seizes upon the fact the Stockholder Plaintiffs only ground their claim on that Scheme, and tries to address it in isolation from the other schemes, arguing that the Stockholder Plaintiffs do not plead any reason to believe that he knew about this particular instance of fraud. But, the Stockholder Plaintiffs have pled facts supporting the inference that Greenberg not only knew about frauds throughout AIG, but that he personally orchestrated several of the most flagrant schemes. The Stockholder Plaintiffs have also pled particularized facts demonstrating Greenberg's dominating and intrusive style of management (according to the Complaint, Greenberg did not even answer to AIG's board), a style that manifested itself in Greenberg's hands-on role in the company's diverse operations. The notion that lower-level employees independently ginned up a bid-rigging scheme without Greenberg's involvement, knowledge, or affirmative approval is not one that can be used as a basis for dismissal at this stage. Having pled Greenberg's intimate involvement in other schemes and his top-level position at AIG, the Stockholder Plaintiffs are entitled to the reasonable inference

that Greenberg also knew about the bid-rigging that was occurring in the municipal derivates market. In addition, having pled that Greenberg was able to engage in unlawful conduct despite AIG's internal controls, the Stockholder Plaintiffs have adequately pled that Greenberg knew that AIG's internal controls were broken, and that Greenberg chose to do nothing, conduct that is also sufficient to support a failure to monitor claim. Thus, I do not dismiss the Stockholder Plaintiffs' claim against Greenberg.

129. *Guttman*, 823 A.2d at 505 (citing *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del.Ch.1949)). The defendants also argue in passing that *Brophy* is outdated, but expressly disavow arguing for dismissal on that basis. Matthews Op. Br. at 31 n. 7. Hence, I treat *Brophy* as good law.

130. *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch.1949).

131. *In re Oracle Corp.*, 867 A.2d 904, 934 (Del.Ch.2004), *aff'd*, 872 A.2d 960 (Del.2005).

132. Complaint ¶ 579.

reasonable inference that they knew of the insider information, and thus the Stockholder Plaintiffs do not state a claim that any insider trading occurred. It is, of course, true that in order to trade on inside information one must first know of the information.[133] But I have already concluded that the Complaint supports the inference that Matthews and Tizzio were aware of pervasive, earnings-inflating frauds at AIG. That knowledge buttresses the *Brophy* claim.

In addition, Matthews and Tizzio both argue that the Stockholder Plaintiffs fail to show that they were motivated at least in part by their knowledge of the fraud at AIG. But, although the Stockholder Plaintiffs do not specifically allege this, they have pled facts that create a reasonable inference that Matthews and Tizzio sold stock to take advantage of their material non-public information. As has been shown, Matthews and Tizzio both were provided huge equity incentive packages, rendering both their total net wealth and ongoing income highly dependent on AIG's stock-trading price. Moreover, much of the fraud alleged was motivated by a desire to prop up that price. If Matthews and Tizzio knew about much or all of the fraud that was occurring, as I must infer at this stage that they did, it is reasonable to assume that they sold their stock to diversify their holdings and lock in the value the market placed on AIG while in ignorance of AIG's real worth.

Notwithstanding this reasonable inference, Matthews and Tizzio argue that they sold so little stock that they were obviously not motivated by the insider information. Although he did sell almost $6 million worth of stock during the relevant period, Tizzio argues that this could not be insider trading because this was only about 7% of his total holdings.[134] And, similarly, Matthews points to the fact that the $20 million worth of stock he sold was only 15% of his AIG stock.[135] In other words, they claim that there could not have been scienter because, if they were going to violate their fiduciary duties, they would have done so on a much more massive scale. But it is not a defense that Matthews and Tizzio could have committed an even larger breach of their fiduciary duties, and this motivation argument is not one I can accept on a dismissal motion.

Furthermore, although it may be that the "small" quantity of stock Matthews and Tizzio sold is evidence of their innocence, that is not the only possible reason for such "small" sales. There are any number of reasons why they might have chosen to keep their insider trading to a limit, not least of which is that they wanted to avoid getting caught or tipping off the market as to the fraud that prompted them to sell their stock. Accordingly, the small scale of their purchases does not defeat the reasonable inference of scienter, and thus I do not dismiss the claims against them.

C. *The Stockholder Plaintiffs State A Claim For Contribution And Indemnification Against Matthews And Tizzio*

Matthews and Tizzio also ask this court to dismiss the separate contribution and

---

133. *See Guttman,* 823 A.2d at 504 (dismissing a *Brophy* claim "[i]n the absence of any fact pleading that supports a rational inference that any of these directors had some basis to believe that [their company's] financial statements were materially misleading in a manner that inflated the company's stock price").

134. Tizzio Op. Br. at 19.

135. Matthews Rep. Br. at 10. That would of course suggest that Greenberg had supported the award to Matthews of equity that was eventually worth $133 million.

indemnification claim against them. Aside from repeating that the Stockholder Plaintiffs do not adequately state a claim that they did anything wrong (which we have already seen is not true),[136] Matthews and Tizzio assert a variety of procedural grounds why AIG should not be able to recover against them. They argue that they are not sufficiently liable, that the claims against them are not ripe, or that the claims against them are barred because they were settled. I address each of these objections in turn.

 First, Matthews and Tizzio assert that even if the Stockholder Plaintiffs have a claim for contribution, their claim for indemnification fails because the Complaint does not explicitly say that they are "entirely liable to AIG." [137] The issue here is that "indemnification differs from contribution because it places the entire burden of a loss upon the party ultimately liable or responsible for it, and by whom the loss should have been discharged initially." [138] In other words, contribution is a remedy between two actors, both of whom broke the law, while indemnification is the remedy for an innocent actor that is liable for indemnifier's conduct. Admittedly, these causes of action address different situations and are thus mutually exclusive.[139] But, neither defendant has pointed out any case in which the indemnification part of a claim was dismissed on the pleadings when it was unclear exactly how a defendant may be liable. A corporation like AIG only acts through humans like Matthews and Tizzio. They have not provided a sound reason why, as between a corporation that only faces liability because a human caused it to break the law, and that human, the corporation should not be indemnified by the human wrongdoer for the harm suffered by the corporation. Perhaps statutes or public policy bar indemnification in certain circumstances, but neither defendant has made arguments of that kind. Given that, I refuse to now indulge the blanket and unsubstantiated assertion that AIG has no plausible indemnification claim against Matthews or Tizzio. Rather, the better practice is to allow these claims to go forward until the nature of Matthews' and Tizzio's liability to AIG is more clear.

 With respect to Matthews' and Tizzio's ripeness objection, the question is one of timing rather than one of actual liability. The issue is that "[u]nder Delaware law claims for common law indemnity do not accrue until the indemnitee can be confident that any claim against him has been resolved with certainty." [140] Given the large number of pending actions brought against AIG as a result of the widespread fraud, it is not surprising that some of them are not fully concluded. Several are concluded, and as an overall matter, there is no question that the Complaint puts Matthews and Tizzio on fair notice of the proceedings that may later

---

136. They also make the rather weak argument that the Stockholder Plaintiffs do not provide enough detail about the harm that AIG experienced. But, as the Stockholder Plaintiffs correctly point out, their Complaint sets out ten separate actions that are either pending or have since been settled. *See* Stockholder Pls.' Ans. Br. at 182–83. Given this level of detail, it is hard to see how Tizzio and Matthews do not have enough information about what claims have been brought against them.

137. Matthews Op. Br. at 26.

138. *Levy v. HLI Operating Co., Inc.*, 924 A.2d 210, 221 (Del.Ch.2007).

139. *See id.*

140. *Quereguan v. New Castle County*, 2006 WL 2522214, at *5 (Del.Ch. Aug.18, 2006).

support a contributory judgment. Although it is true that the contribution and indemnification claims for the pending actions will not formally accrue until these claims are finally resolved, Delaware courts have taken a pragmatic approach to the ripeness of a contribution claim when the defendant faces a viable direct claim for the same conduct buttressing the contribution claim. In the interests of judicial economy, Delaware courts allow contribution and indemnification claims to proceed along with the claims that will create liability, considering the claim to be ripe even when it has not yet accrued.[141] This instance is slightly different because the claims that will support a right of indemnification or contribution are proceeding elsewhere and not in this court. But, making the Stockholder Plaintiffs bring separate actions or file an amended complaint as each of the remaining actions is completed would only burden the court, AIG's stockholders, and the defendants themselves. This action is currently stayed pending the outcome of one action,[142] and many of the other actions will likely be resolved before this action is decided. Accordingly, it is not appropriate to dismiss any action from being considered for contribution or indemnification until it is clear what will or will not be reduced to a settlement or verdict by the time this case is decided. Rather, I will address the legitimate concerns of Matthews and Tizzio about timing when the contribution claims against them are tried.

 Finally, Matthews and Tizzio argue that AIG cannot seek contribution or indemnification for claims that it settled. But that argument simplifies our law. The statute Matthews and Tizzio cite to only prevents a party that has settled from suing another party whose liability was not extinguished by that settlement; it does not prevent the settling party from suing a joint-tortfeasor whose liability was settled in the same settlement.[143] In other words, if AIG entered into a settlement agreement that did not absolve Matthews or Tizzio, it cannot sue them for their share of the settlement, but if that settlement agreement extinguished claims against Matthews and Tizzio as well, then AIG may sue. Although I do not have a complete record in front of me, it is clear at this stage that at least some of the settlements released Matthews and Tizzio from liability along with AIG.[144] And as to

141. *See Daystar Constr. Mgmt., Inc. v. Mitchell*, 2006 WL 2053649, at *11 (Del.Super. July 12, 2006) ("[I]f contribution or indemnification claims are brought as derivative[,] cross or third-party claims, i.e., the claimant's right to indemnification or contribution is contingent upon the success of the plaintiff's direct claim against him, then the court may adjudicate all claims together in the interest of judicial economy.").

142. *See In re Am. Int. Group, Inc. Consol. Deriv. Litig.*, C.A. No. 769 (Del. Ch. Apr. 3, 2008) (ORDER) (staying this action in favor of a securities action in New York).

143. 10 *Del. C.* § 6302(c) ("A joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by

the settlement."). The rule is the same under a federal statute Matthews and Tizzio cite. *See* 15 U.S.C. § 78u–4(f)(7)(A)(ii).

144. *See, e.g.*, American International Group, Inc., Current Report (Form 8–K) at Ex. 10.3 (Feb. 09, 2006) (releasing, among others, all current and former AIG officers and directors from liability arising out of the Workers' Contribution Scheme). This 8–K was incorporated into the Complaint by reference. *See* Compl. ¶ 85; *See Vanderbilt Income & Growth Assoc's v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del.1996) (holding that a document outside the complaint will not convert a motion to dismiss to one for summary judgment where "the document is integral to a plaintiff's claim and incorporated into the complaint").

the remaining settlements, the present record does not provide a basis to conclude that AIG has settled cases in a manner that bars it from seeking contribution from Matthews and Tizzio. Notably, Matthews and Tizzio have not cited any precedent for dismissing a claim at this stage of the litigation because it is not clear whether or not the settlement also extinguished their liability and thus I do not dismiss the contribution and indemnification claims against them.[145]

D. *The Stockholder Plaintiffs State A Claim That Tizzio Committed Fraud And Engaged In A Conspiracy To Defraud AIG*

■ Tizzio also argues that the fraud and conspiracy claims against him arising out of the Gen Re Transaction should be dismissed for failure to state a claim. The Stockholder Plaintiffs have argued that Tizzio both committed fraud and was part of a conspiracy to commit that fraud. But, Tizzio argues that the Stockholder Plaintiffs have not pled his involvement with the requisite particularity and that, in any case, the involvement of other AIG insiders exculpates him from liability. But, both of those arguments fail as a matter of law.

■ Under our law, fraud can occur on in one of three ways: (1) an overt misrepresentation; (2) silence in the face of a duty to speak; or (3) active concealment of material facts.[146] Here, the Stockholder Plaintiffs base their claim on the second manner which 'ascribes the most reasonable, probable and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished.' " *Nationwide Ins. Co. v. Schneider*, 906 A.2d 586, 595 (Pa.Super.2006), *aff'd*, 960 A.2d 442 (Pa.2008) (quoting *Sparler v. Fireman's Ins. Co. of Newark, N.J.*, 360 Pa.Super. 597, 521 A.2d 433, 435 (1987), *appeal denied*, 518 Pa. 613, 540 A.2d 535 (1988)). The only issue in the PNC litigation was about liability for PNC's misstatements. Nothing about AIG's internal affairs or the duties of its officers and directors was implicated. This is not surprising as it was a class action brought by PNC stockholders, not AIG stockholders. Accordingly, I find that the most reasonable, probable, and natural meaning of the bar order in question is that it only covers claims directly related to liability to PNC shareholders for PNC's material misstatements. Thus, it does not bar any claim against Matthews for his separate liability to AIG for breaching his fiduciary duties to that entity or its stockholders. Any other reading of the bar order would raise serious due process concerns.

---

**145.** *See O'Brien v. Shanks*, 1986 WL 7992, at **1–2 (Del.Super. June 11, 1986) (declining to dismiss a contribution claim where it was unclear if a settlement had released both the plaintiff and the defendant). Matthews does assert that one of these settlements, which was about AIG's liability in a securities action against PNC, bars any AIG claim against him relating to the sale of C–GAITS to PNC. As part of the settlement in that action, AIG received a federal court order resolving any claims against AIG officers and directors related to PNC's violation of federal securities law by using faulty SPEs to misstate its balance sheet. Matthews advances an unreasonably broad reading of the bar order that ended that litigation to argue that this settlement should also bar claims against him based on AIG's separate legal violations as part of the PNC scheme. But, the bar order only covers claims relating to the subject of the securities action: PNC's misstated financials. According to the stipulation by the parties to the settlement, the bar order is governed by Pennsylvania law. *See* Matthews Op. Br. Ex. G. ¶ 42 ("The construction, interpretation, operation, effect and validity of this Stipulation and all documents necessary to effectuate it, shall be governed by the internal laws of the Commonwealth of Pennsylvania ... except to the extent that federal law governs."). And, under Pennsylvania law "[a] settlement and release agreement should be interpreted in a

**146.** *Stephenson v. Capano Dev. Inc.*, 462 A.2d 1069, 1074 (Del.1983) ("[O]ne is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading.").

type of fraud, alleging that as an AIG director and officer, Tizzio had a duty to speak,[147] and that Tizzio failed to disclose the illegitimate nature of the Gen Re Transaction to AIG's independent directors and Audit Committee despite that duty.[148]

▬▬ And, the Stockholder Plaintiffs allege that Tizzio was part of the conspiracy to carry out the Gen Re Transaction. In Delaware, civil conspiracy is an independent wrong that occurs when there is: "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage." [149]

▬▬ Both fraud and a conspiracy to commit fraud must be alleged with particularity.[150] Tizzio attempts to seize on this requirement of particularity to argue that the Stockholder Plaintiffs do not sufficiently plead that he committed fraud or engaged in the conspiracy in question. In making this argument, Tizzio does not dispute that the fraud itself is stated with the requisite particularity. And with good reason, as the Stockholder Plaintiffs devote over thirty pages to describing the ins and outs of the Gen Re Transaction and the conspiracy that allegedly existed to make the Transaction appear legitimate. Instead, as in the duty of loyalty claims against him, Tizzio focuses on whether the Stockholder Plaintiffs adequately tie him to the Transaction. But, even though fraud must be stated with particularity, this is still a motion to dismiss, and the

147. *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del.1989) (holding that "the duty of candor is one of the elementary principles of fair dealing, Delaware law imposes this unremitting obligation not only on officers and directors, but also upon those who are privy to material information obtained in the course of representing corporate interests" and "[t]he silence of [certain fiduciaries] in the face of their rigorous affirmative duty of disclosure ... was a fraud upon the board.").

148. *See Stephenson*, 462 A.2d at 1074 ("[O]ne is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *7 (Del.Ch. Aug.26, 2005) ("[W]here there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.").

149. *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149–50 (Del.1987) (citing *McLaughlin v. Copeland*, 455 F.Supp. 749, 752 (D.Del.1978), aff'd, 595 F.2d 1213 (3d Cir.1979)). Some jurisdictions have abandoned the independent tort of conspiracy. *See Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102, 102 (1986)

("[A] mere conspiracy to commit a [tort] is never of itself a cause of action." (quoting *Brackett v. Griswold*, 112 N.Y. 454, 20 N.E. 376, 379 (1889)) (second modification in original)). But, Delaware has never done so. The reason some states have gotten rid of a separate tort for civil conspiracy is because it does not state a separate harm suffered by the plaintiff and any co-conspirator can be held liable for the underlying tort using imputation principles. *Alexander & Alexander*, 510 N.Y.S.2d 546, 503 N.E.2d at 103; *Hutchins v. Hutchins*, 7 Hill 104 (N.Y.Sup.Ct.1845) (cited in *Brackett*, 112 N.Y. 454, 20 N.E. 376 at 379). That is, the utility of the conspiracy concept is that a person who did not commit all the required elements of a tort can still be held liable if her co-conspirators' joint actions completed the tort. *Nicolet*, 525 A.2d at 150 ("Under Delaware law, a conspirator is jointly and severally liable for the acts of co-conspirators committed in furtherance of the conspiracy."). For whatever reasons, our law has allowed a plaintiff to state both a conspiracy claim and a claim for the underlying tort. It is not in the power of this trial court to change that.

150. Ct. Ch. R. 9(b); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207 (Del.Ch.2006) ("[A] claim of conspiracy to commit fraud must be pleaded with particularity.").

Stockholder Plaintiffs are entitled to have me draw all reasonable inferences in their favor.

In a case like this one, "where pleading a claim of fraud ... that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it."[151] As I have stated before, I believe that the pled facts support the inference that, as the Stockholder Plaintiffs allege, Tizzio knew the Gen Re Transaction was a sham. I have discussed why that is so before. To briefly reiterate, Tizzio was one of Greenberg's top aides, sat on the reinsurance security committee, and was head of AIG's General Insurance division, which includes the subsidiary that wrote the fake reinsurance policy. Together these alleged facts create the reasonable inference that the true nature of the transaction was knowable and that Tizzio was in a position to know that the Gen Re Transaction was a sham.

Having adequately pled fraud, the Stockholder Plaintiffs are entitled to an inference that Tizzio did so not as an independent actor, but rather as part of the conspiracy to defraud AIG. Even to prevail at trial the Stockholder Plaintiffs do not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators.[152] And to survive a motion to dismiss, all that is needed is a reasonable inference that Tizzio was part of this conspiracy. Given Tizzio's relationship with Greenberg and others involved in the Gen Re Transaction, a fair inference of Tizzio's complicity in concerted misconduct exists.

Tizzio also argues that any malfeasance was immunized by the fact that other members of Greenberg's Inner Circle knew the Gen Re Transaction was a hoax, and thus AIG was not deceived. To make this argument, Tizzio does not assert that the independent directors on AIG's board of directors knew of this transaction. Instead, he attempts to use a legal shortcut. As Tizzio correctly notes, the knowledge of an agent is normally imputed to the agent's principal.[153] From this, Tizzio argues that as a matter of law AIG "knew" the Transaction was a sham because AIG had employees that knew the Transaction was a sham. But, under Delaware law, where officers and directors have disabling conflicts that give them an interest in hiding information from a corporation's independent directors and stockholders, the conflicted fiduciaries' knowledge is not imputed to the corporation for purposes of holding those fiduciaries liable for the harm they caused to the corporation.[154] In

---

151. *Metro Commc'n Corp. BVI v. Advanced Mobileconnm Techs. Inc.*, 854 A.2d 121, 147 (Del.Ch.2004) (quoting *IOTEX Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. Dec.21, 1998)).

152. *Empire Fin. Servs., Inc. v. Bank of N.Y.*, 900 A.2d 92, 97 n. 16 (Del.2006) ("[T]he conspirators' 'agreement need not be expressed in words and may be implied and understood to exist from the conduct itself.'" (quoting RESTATEMENT (SECOND) OF TORTS § 876(a) cmt. a. (1979))).

153. *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1996 WL 111133, at *2 (Del.Super.Feb.22, 1996).

154. *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 n. 22 (Del.Ch.2003), *aff'd*, 847 A.2d 1121 (Del.2004) ("When corporate fiduciaries ... have a self-interest in concealing information—such as the falsity of the financial statements that they had helped prepare—their knowledge cannot be imputed to the corporation.").

colloquial terms, a fraud on the board has long been a fiduciary violation under our law and typically involves the failure of insiders to come clean to the independent directors about their own wrongdoing, the wrongdoing of other insiders, or information that the insiders fear will be used by the independent directors to take actions contrary to the insiders' wishes.[155] Delaware law provides no safe harbor to high-level fiduciaries who group together to defraud the board. The Stockholder Plaintiffs have alleged that Tizzio and the other AIG insiders who participated in the Gen Re Transaction violated their fiduciary duties by causing AIG to engage in illegal conduct. If true, that was bad faith conduct that gave Tizzio and the other guilty insiders an interest in hiding what they had done. As a result, the knowledge of those culpable fiduciaries is not imputed to AIG, and Tizzio cannot draw immunity by being among a complement of other AIG top managers who are also alleged to have violated their fiduciary duties and committed fraud on the board.

For all of these foregoing reasons, I deny Tizzio's motion to dismiss the fraud and conspiracy claims against him.

Having addressed the heavily fact dependent claims against Matthews and Tizzio, I now turn to the procedurally based claims brought by various defendants. The first of these is the argument that the Complaint should be dismissed because no demand was made on AIG's board. But,

as we shall see, in this unique circumstance AIG created an SLC that chose to take no position on the claims that the Stockholder Plaintiffs have brought, and thus demand was futile.

E. *Because AIG's Board Delegated Authority Over This Lawsuit To The SLC And The SLC Has Taken No Position, Demand Is Excused*

■■■ Defendants Greenberg, Tizzio, Matthews, and PWC have all filed separate briefs seeking to have all the claims asserted by the Stockholder Plaintiffs against them dismissed for failure to make a demand on AIG's board of directors. These defendants argue that demand was not futile with respect to the board of directors that existed back in 2004 and 2005, when the first claims in this action were brought, and that even to the extent it was, the Stockholder Plaintiffs have pled nothing to support demand futility with respect to the board of directors in 2007 and 2008 (when the two most recent versions of the Stockholder Plaintiffs' complaints were filed). The Stockholder Plaintiffs respond that the SLC's adoption of a "no position" stance excused demand as to all of the claims they bring against the defendants in this case. I agree with that argument.

■■■ Under Delaware law, the directors, rather than the stockholders, are empowered to manage a corporation.[156]

---

155. *See Macmillan*, 559 A.2d at 1283 (holding that "[a]t a minimum, [the duty of candor] dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations," and that violation of this duty constitutes "a fraud upon the board"); *HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 119 (Del.Ch.1999) (holding that two directors were guilty of fraud on the board where they kept the self-interest of one of them in certain transactions

being considered by the board secret from the rest of the board).

156. *See 8 Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984) ("A cardinal precept of the General Corporation Law of the State of Delaware is that directors,

This includes control over litigation brought in the corporation's name. To prevent derivative suits from usurping this right, a stockholder seeking to bring such a suit must normally first make on a demand on the board of directors.[157] But, demand is excused when it is futile.[158] As a result, when bringing a derivative suit, a stockholder plaintiff is required to "allege with particularity the efforts, if any, made by the [stockholder] plaintiff to obtain the action the [stockholder] plaintiff desires from the directors or comparable authority and the reasons for the [stockholder] plaintiff's failure to obtain the action or for not making the effort." [159]

█ The demand requirement does not exist for the benefit of defendants in derivative suits.[160] It exists to preserve the primacy of board decisionmaking regarding legal claims belonging to the corporation.[161] Our law implements this policy objective by establishing the default rule that a derivative plaintiff must make a demand on the board and requiring the plaintiff to prove why demand is excused if she chooses to forego that default route.[162]

But, this is not the typical situation where a corporation is objecting to litigation brought in its name.[163] Here, the AIG board's primacy in decisionmaking has

---

rather than stockholders, manage the business and affairs of the corporation.").

**157.** *Aronson*, 473 A.2d at 811–12 ("By its very nature the derivative action impinges on the managerial freedom of directors. Hence, the demand requirement of Chancery Rule 23.1 exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits." (footnote omitted)).

**158.** *See Zapata Corp. v. Maldonado*, 430 A.2d 779, 784 (Del.1981) ("[A] stockholder may sue in equity in his derivative right to assert a cause of action in behalf of the corporation, without prior demand upon the directors to sue, when it is apparent that a demand would be futile, that the officers are under an influence that sterilizes discretion and could not be proper persons to conduct the litigation." (quoting *McKee v. Rogers*, 156 A. 191, 193 (Del.Ch.1931))).

**159.** Ct. Ch. R. 23.1(a).

**160.** Instead, our law makes it clear that demand exists for the benefit of the corporation itself. *Aronson*, 473 A.2d at 811–12 ("[T]he demand requirement of Chancery Rule 23.1 exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits."); *Pogostin v. Rice*, 1983 WL 17985, at *3 (Del.Ch. Aug.12, 1983), *aff'd*, 480 A.2d 619 (Del.1984), (noting that Rule 23.1 "is designed to give a corporation, on whose behalf a derivative suit is brought, the opportunity to rectify the alleged wrongs without

suit or to control any litigation brought for its benefit").

**161.** *Aronson*, 473 A.2d at 811–12; *see also Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) ("Because such derivative suits challenge the propriety of decisions made by directors pursuant to their managerial authority, we have repeatedly held that the stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim."); *Emerald Partners v. Berlin*, 1993 WL 545409, at *3 (Del.Ch. Dec.23, 1993) ("The demand requirement of Rule 23.1 reflects the principle of Delaware corporate law that the directors of a corporation are responsible for managing the business and affairs of the corporation. Compliance with the pre-suit demand requirement of Rule 23.1 is more than a procedural matter—it is a matter of substantive right." (citations omitted)).

**162.** *Brehm v. Eisner*, 746 A.2d 244, 255–256 (Del.2000).

**163.** *See Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 732 (Del.1988) (noting that the "procedural settings in *Aronson* and its progeny involve motions to dismiss for failure to make demand brought by the corporations on whose behalf the derivative actions were asserted" (citing *Aronson*, 473 A.2d at 808; *Pogostin*, 480 A.2d at 622; *Grobow v. Perot*, 526 A.2d 914, 917 (Del.Ch.1987); *Good v. Getty Oil Co.*, 514 A.2d 1104, 1106 (Del.Ch.

been fully honored. The AIG board invested complete authority in an SLC to decide what position the corporation would take with regard to this lawsuit.[164] This case was then delayed for a lengthy period during which the SLC evaluated what position to take.

The SLC's task was a complicated one, especially given the reality that the fraudulent schemes pled in the Complaint were ones that exposed AIG itself to liability. Thus, the SLC had to weigh the advantage of having AIG prosecute claims against the defendants with the disadvantage of affirmatively accusing AIG officials of wrongful acts that third-party plaintiffs would impute to AIG itself. In the end, the SLC chose to have AIG sue Greenberg and Smith itself, to seek dismissal of certain defendants, and to otherwise take no position on the Stockholder Plaintiffs' claims. Consistent with the nature of complex litigation, the Stockholder Plaintiffs' claims evolved to some extent after the SLC made its initial decision to take no position. But, the SLC has remained empowered to address the lawsuit and has reiterated as to some newer counts brought by the Stockholder Plaintiffs that it continues to take no position.[165]

Given this reality, the Stockholder Plaintiffs need not make a demand because demand would be futile. The SLC has had a full and fair opportunity to decide whether to prosecute the claims brought by the Stockholder Plaintiffs, seek their dismissal, or take no position and permit the Stockholder Plaintiffs to proceed. Having taken the latter course, the SLC recognized that the Stockholder Plaintiffs would go forward without the demand requirement being a barrier to their claims.[166]

The SLC's decision, although unusual, is not unprecedented and, as noted, is likely inspired in some part by the cross-cutting pressures faced by AIG. The effect of that decision on this lawsuit is dictated by prior precedent, which is based on sound logic. In *Kaplan v. Peat, Marwick, Mitchell & Co.*, the only case the parties have cited addressing a situation where a board that refused to take a position on derivative litigation, our Supreme Court found that:

> When a corporation takes a position regarding a derivative action asserted on its behalf, it cannot effectively stand neutral. Because of the inherent nature of the derivative action, a corporation's failure to object to a suit brought on its behalf must be viewed as an approval for the shareholders' capacity to sue derivatively. We hold, therefore, that when a corporation chooses to take a position in regards to a derivative action asserted on its behalf, it must affirmatively object to or support the continuation of the litigation.[167]

1986); *Moran v. Household Int'l Inc.*, 490 A.2d 1059, 1069 (Del.Ch.1985))).

**164.** 8/7/07 Tr. at 17–18.

**165.** As recently as the filing of the Complaint in April 2008, the SLC stated "AIG, by and through its designated Special Litigation Committee, takes no position as to the remainder of the [the Complaint]." Compl. at 1. And, after oral argument on these motions, the SLC informed this court that "AIG does not endorse [the claims about the Municipal Derivatives Scheme] and does not plan to take further action with respect [to them]."

Letter from Stuart L. Shapiro, Shapiro Forman Allen & Sava LLP, to Vice Chancellor Leo E. Strine, Jr. (Nov. 10, 2008). Even if the SLC's previous communications had not shown the futility of a demand upon them, this letter shows that any demand upon the SLC would be futile in the truest sense of the word.

**166.** *See* 8/7/07 Tr. at 8.

**167.** *Kaplan*, 540 A.2d at 731; *see also Spiegel v. Buntrock*, 571 A.2d 767, 775 (Del.1990) ("[W]hen a board of directors is confronted

Accordingly, the Supreme Court considered the board's position of neutrality to be a "tacit approval for the continuation of the litigation." [168]

The moving defendants seek to avoid this precedent by nitpicking and psychoanalyzing the SLC's motivations. They argue that the SLC really did not approve of these suits, but merely considered allowing them to go forward to be the lesser of two evils. Specifically, they point to a statement the SLC's counsel made to this court that the reason the SLC took no position was because the "defendants appeared to have good defenses and the SLC thought it not in the interest [of AIG], given pending class actions, to ventilate its investigative record." [169] The defendants argue that because the SLC chose not to oppose the claims because they feared that taking that route might expose information developed in the SLC's investigation to parties with interests adverse to AIG, the SLC did not endorse the derivative claims, and thus the Stockholder Plaintiffs should be required to make a demand on the full board, which may not have the same concerns about disclosure. [170]

That reasoning, however, is unpersuasive. As stated above, the point of Rule 23.1 is to prevent stockholders from usurping the board's right to manage the affairs of the corporation. [171] Here, there is no such concern. AIG's board has decided to give full authority to the SLC to address this litigation, and through its duly empowered SLC, the AIG board has had the chance to assert control over this lawsuit, prosecute some claims and dismiss others. Instead, it chose to take over two claims, seek the dismissal of certain defendants, and take no position on the rest of the litigation. Its decisionmaking primacy has been honored, and that is all our law requires.

■ The demand requirement is not, as these defendants would have it, an immunity shield for defendants. It is an assurance that the stockholders' duly elected representatives control the legal rights of the corporation unless there is a basis for excusing their control. In fact, the particularized pleading requirement of Rule 23.1 is expressly designed to ensure that boards are not lightly bypassed by derivative plaintiffs; that is why a plaintiff hoping to avoid demand must plead particularized facts demonstrating the board's inability to impartially respond to a demand or a breach of fiduciary duty claim. [172] The latter method of bypass is related to the first, in the sense that if a

with a derivative action asserted on its behalf, it cannot stand neutral.").

**168.** *Kaplan*, 540 A.2d at 731.

**169.** 8/7/07 Tr. at 9.

**170.** *See* Third–Party Defs.' Op. Br. at 23 ("Because the SLC has declined to stake out a position on the Third–Party Claims for strategic reasons, Plaintiffs remain obligated to make a demand on the Board.").

**171.** *See Aronson*, 473 A.2d at 811–12 (noting that Rule 23.1 exists to make sure that before bringing a derivative suit a stockholder "ex-

hausts his intracorporate remedies" and to prevent "strike suits").

**172.** *See* Ct. Ch. Rule 23.1(a) (requiring that a derivative complaint "also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort"); *Brehm*, 746 A.2d at 253 (noting that, to excuse demand, this court "must decide whether, under, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business

plaintiff can satisfy a particularized pleading standard for pleading a fiduciary breach, the intuition is that the board faces a sufficiently real threat of liability that it cannot act objectively on the demand.[173]

■ When, however, a corporate board has had the chance to consider what position to take regarding a derivative suit and has decided to take no position, the resulting procedural implications are clear. Demand in such a situation is excused, and the derivative plaintiff is free to proceed against the defendants under the procedural rules ordinarily applicable. In particular, this means that the derivative plaintiff may survive dismissal of its complaint if it pleads a non-exculpated claim for breach of fiduciary duty under the plaintiff-friendly Rule 12(b)(6) standard.[174]

### F. The Claims Against Matthews And Tizzio Are Not Time–Barred

Finally, Matthews and Tizzio argue that the Stockholder Plaintiffs have not brought their claims in a timely manner and are thus barred from bringing them.[175] Some of the frauds that are alleged in the Complaint date back over a decade. As a result, Matthews that Tizzio argue that the statutes of limitations on some of the frauds have long since run, and thus the Stockholder Plaintiffs can no longer bring claims based on them. Specifically at issue are the Municipal Derivatives Scheme, the Workers' Compensation Scheme, and the C–GAITS transactions.

■ Under Delaware law, a cause of action normally accrues at the moment

judgment" (quoting *Aronson*, 473 A.2d at 814)).

173. See *Guttman*, 823 A.2d at 500 (noting that the second *Aronson* prong "releases a suit for prosecution when the complaint meets a heightened pleading standard of particularity, because in these circumstances the threat of liability to the directors required to act on the demand is sufficiently substantial to cast a reasonable doubt over their impartiality.").

174. Greenberg, Smith, and Matthews have also moved to have the claims against them be dismissed due to a perceived procedural defect under Rule 23.1. Their beef is that certain defendants were dropped from the case when the SLC and the Stockholder Plaintiffs filed the Combined Amended Complaint. This was accomplished by simply omitting those defendants from the Combined Amended Complaint, the first complaint filed by the Stockholder Plaintiffs after the SLC completed its investigation, as well as the current Complaint. The movants argue that the authorization granted by this court for filing the Combined Amended Complaint as well as the current Complaint did not amount to formal approval of the dismissal of the claims against the those defendants. As the moving defendants correctly point out, under Rule 23.1(c), an "action cannot be dismissed or compromised without the approval of the Court." Greenberg, Smith, and Matthews argue that dropping defendants from recent complaints triggered Rule 23.1, and thus this court had to pass upon the propriety of removing the dropped defendants from the complaints that have been filed since the SLC completed its investigation. But, any latent ambiguity has been cleared up since oral argument because the Stockholder Plaintiffs have submitted, and I have approved, an order dismissing the claims against the defendants in question. In re Am. Int'l Group, Inc. Consol. Deriv. Litig., C.A. No. 769 (Del. Ch. Nov. 12, 2008) (ORDER). This obviates any concern these movants had about this, frankly, rather trifling issue, by which these movants sought to turn what was at most a minor procedural snafu into a personal immunity from accountability to AIG for their conduct. See *Wied v. Valhi, Inc.*, 466 A.2d 9, 16 (Del. 1983) (finding that where a failure to comply with Rule 23.1 was subsequently remedied and that the requirements of justice were satisfied, there was no breach of fiduciary duty).

175. PWC makes a similar argument, stating that because the some of their allegedly negligent conduct occurred more than three years before the Stockholder Plaintiffs brought a claim, the claims about that conduct are time-barred. But, because I dismiss the claims

of the alleged harmful act.[176] Even though this is a court of equity, equity follows the law, and this court will apply statutes of limitations by analogy.[177] For a breach of fiduciary duty or fraud claim, the statute of limitation is three years.[178]

Tizzio argues that because the Workers' Compensation Scheme ended in the 1990s, AIG's stockholders have long since missed their chance to bring claims against him based on that Scheme. Similarly, Matthews notes that the only C–GAITS described in detail were sold to PNC in 2001 and no claim was brought against him until more than three years later, in February 2005. Finally, both Tizzio and Matthews argue that, by the Stockholder Plaintiffs' own admission, the Municipal Derivatives Scheme ended in December 2003, and thus the claims relating to that fraud are barred because they were not asserted until April 2008.

But, the only reason that it took so long to bring any of these claims is because AIG's public filings, upon which its stockholders were entitled to rely, concealed the wrongdoing. Under the doctrine of equitable tolling, if Matthews and Tizzio did betray AIG in the manner that the Stockholder Plaintiffs allege, Matthews and Tizzio cannot escape liability because it took time for AIG's stockholders to discover their bad faith.[179] "[T]he doctrine of equitable tolling stops the statute [of limitations] from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary. No evidence of actual concealment is necessary in such a case...."[180] Because their claims are brought outside the applicable limitations period, the Stockholder Plaintiffs must plead facts that support the existence of equitable tolling.[181] But, if they meet this burden, and equitable tolling applies, the statute of limitations is tolled until the Stockholders Plaintiffs were *"objectively aware of the facts giving rise to the wrong, i.e., on inquiry notice."* [182]

Tizzio attempts to circumvent this inquiry in the first instance by arguing that equitable tolling only applies to cases of pure self-dealing. Where fiduciaries have engaged in fraud that artificially inflates the corporation's balance sheet, he

---

against PWC on other grounds, I do not reach that argument.

**176.** *Albert v. Alex. Brown Management Services,* 2005 WL 1594085, at *18 ("The law in Delaware is crystal clear that a claim accrues as soon as the wrongful act occurs.").

**177.** *See U.S. Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Sys., Inc.,* 677 A.2d 497, 502 (Del.1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

**178.** 10 *Del. C.* § 8106(a); *In re Tyson Foods, Inc.,* 919 A.2d 563, 584 (Del.Ch.2007); *Crowhorn v. Nationwide Mut. Ins. Co.,* 2002 WL 1767529, at *5 (Del.Super. July 10, 2002).

**179.** The Stockholder Plaintiffs have also asserted that other tolling doctrines apply, but I do not address their other theories because I find equitable tolling applicable.

**180.** *Tyson Foods,* 919 A.2d at 585.

**181.** *State ex rel. Brady v. Pettinaro Enters.,* 870 A.2d 513, 525 (Del.Ch.2005) (noting that the normal plaintiff-friendly standard of a Rule 12(b)(6) does not apply and instead "[a] plaintiff asserting a tolling exception must plead facts supporting the applicability of that exception.').

**182.** *In re Dean Witter P'ship. Litig.,* 1998 WL 442456, at *6 (Del.Ch. July 17, 1998) (emphasis in original); *see also Weiss v. Swanson,* 948 A.2d 433, 451 (Del.Ch.2008). Matthews also argues that, at least as to him, some claims are barred because he left AIG in December 2003. But, equitable tolling applies until there is inquiry notice of the claims. Regardless of when he left, Matthews has not provided any indication that the Stockholder Plaintiffs were privy to information that should have put them on notice before April 2005.

says that equitable tolling does not apply. But, although he can point to some case law support for that assertion, I do not believe that position is an accurate reflection of our law. The obvious purpose of the equitable tolling doctrine is to ensure that fiduciaries cannot use their own success at concealing their misconduct as a method of immunizing themselves from accountability for their wrongdoing.[183] Where the fiduciaries of a Delaware corporation engage in wrongdoing that involves the manipulation of the corporation's financial statements and public disclosures, and where the manipulation of those statements has the effect of misleading investors, it is no defense to argue that the stockholders were somehow on inquiry notice simply because the misconduct did not involve pure self-dealing. Many of the worst acts of fiduciary misconduct have involved frauds that personally benefited insiders as an indirect effect of directly inflating the corporation's stock price by the artificial means of cooking the books. To allow fiduciaries who engaged in illegal conduct to wield a limitations defense against stockholders who relied in good faith on those fiduciaries when their disclosures provided no fair inquiry notice of claims would be inequitable.

Of course, the equitable tolling doctrine only applies if the Stockholder Plaintiffs were actually lulled into repose by AIG's public filings. If AIG's public filings had given the Stockholder Plaintiffs good reason to be suspicious about the existence of a claim more than three years before the filing of that claim—i.e., if the public filings provided them with inquiry notice—tolling would have then stopped and the Stockholder Plaintiffs would now be barred.[184] But, neither Matthews nor Tizzio has pointed to public notice given by AIG that would have provided fair inquiry notice within the relevant time frame.[185]

183. *See Kahn v. Seaboard Corp.*, 625 A.2d 269 (Del.Ch.1993) (noting "equity's long-standing flexibility in tolling limitations with respect to actions involving fraud ... even where affirmative acts of concealment have not been alleged" and that " 'most especially does equity relieve against any attempt to use the statute as a cover for fraud' " (quoting *Sparks v. Farmers' Bank*, 3 Del.Ch. 274 (1869))); *Williamson v. New Castle County*, 2002 WL 453926, at *4 n. 18 (Del.Ch. Mar.13, 2002) (noting that "a statute of limitation is often not binding on a court of equity" and suggesting that the statute would not apply in "circumstances that would clearly make the application of that rule inequitable and unjust" (citing *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del.1982))); *Yaw v. Talley*, 1994 WL 89019, at *5 (Del.Ch. Mar.2, 1994) ("[F]iduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute [of limitations].").

184. *Dean Witter*, 1998 WL 442456, at *6 (holding that the statute of limitations "is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury." (emphasis in original)).

185. Matthews and Tizzio do argue that any claim related to the C–GAITS products is not timely because of an AIG press release issued in early 2002. But, that argument fails for two reasons. The first is that the press release was not a part of the Complaint and Matthews has not indicated any state or federal government that it was filed with, and therefore I cannot consider it. *Tyson Foods*, 919 A.2d at 585 (holding that to determine if there was inquiry notice one can consider "(a) documents expressly referred to and relied upon in the complaint itself, and (b) documents that are required by law to be filed, and are actually filed, with federal or state officials."). And, even if I could, the press release simply indicates that PNC restated its financial information and suggests that AIG had properly accounted for its investments in these entities all along, a statement that would not put a reader on inquiry notice that there were problems at AIG. Similarly, in a single footnote Matthews notes that the Complaint states that in January 2002 Brightpoint announced that it had to restate its earnings.

Accordingly, the claims against them are not time-barred.[186]

Having addressed all of Matthews' and Tizzio's arguments, I now address the claims of the Employee Defendants' argument that this court has no personal jurisdiction over them.

### G. This Court Has No Jurisdiction Over The Employee Defendants Who Served Only As AIG Officers Or Employees

The Employee Defendants have all moved to have the claims against them dismissed for lack of personal jurisdiction. None of these defendants resides in Delaware, worked in Delaware for AIG, or committed an act in Delaware relevant to this case. Importantly, at the time of the wrongs of which they are accused, Delaware had not yet revised 10 Del. C. § 3114 to expand its scope to reach corporate officers.

The Employee Defendants argue that this court may not exercise personal jurisdiction over them. The Stockholder Plaintiffs have responded by relying upon the so-called "conspiracy theory" of personal jurisdiction, a theory most associated in our state's jurisprudence with the Su-

preme Court's decision in *Istituto Bancario*, which recognized that theory in our law.[187] The Stockholder Plaintiffs argue that the Complaint pleads facts that satisfy the test outlined in *Istituto* and that the satisfaction of that test is enough to sustain this court's jurisdiction.

■■■■ The fundamental problem for the Stockholder Plaintiffs, however, is that the conspiracy test must, when deployed, satisfy both necessities for the exercise of personal jurisdiction over this court which are: 1) that a statute permits service of process on the defendants; and 2) that exerting jurisdiction over the defendants will not offend the Due Process Clause of the Fourteenth Amendment of the United States Constitution.[188] Although the Stockholder Plaintiffs muster a good effort at showing why the latter requisite is met, they have not pointed to a statutory basis for service on the Employee Defendants.

■■■ The conspiracy theory of jurisdiction has often been used by plaintiffs in concert with Delaware's long-arm statute, 10 Del. C. § 3104. The value of this combination is that acts of one conspirator that satisfy the long-arm statute can be attributed to the other conspirators.[189] In par-

---

But, the press release in question did not even mention AIG by name, and thus did not provide inquiry notice. Brightpoint Inc., Current Report (Form 8–K) at Ex. 99.1 (Feb. 05, 2002).

**186.** Finally, Matthews and Tizzio argue that a 2005 Internal Revenue Service investigation into the Municipal Derivatives Scheme that is described in the Complaint provided inquiry notice about that Scheme. Compl. ¶ 406. Because the first complaint bringing claims about the Municipal Derivatives Scheme was filed in April 2008, if there was inquiry notice before April 2005, then equitable tolling does not help the Stockholder Plaintiffs. But the Complaint does not state that the IRS investigation began before April 2005, nor does the Complaint state that the IRS investigation

was public as of that time. Nor do Matthews and Tizzio point to any public filing before April 2005 relating to this investigation, and therefore I refuse to base a dismissal on it. They can renew this application on summary judgment if they have actual proof of inquiry notice.

**187.** *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210 (Del.1982).

**188.** *See Hercules Inc. v. Leu Trust and Banking (Bahamas) Limited*, 611 A.2d 476, 480–81 (Del.1992).

**189.** *HMG/Courtland Properties*, 729 A.2d at 307 (Del.Ch.1999) ("The conspiracy theory works well in tandem with § 3104 because a conspiracy analysis is relevant to determining

ticular, the theory has been successfully used in concert with § 3104(c)(3).[190]

Section 3104(c)(3) provides for personal jurisdiction over a defendant who "in person *or through an agent:* [c]auses tortious injury in the State by an act or omission in this state."[191] For jurisdictional purposes, conspirators are considered agents of each other when acting in furtherance of the conspiracy.[192] Thus, when the *Istituto* conspiracy test is met, § 3104(c)(3) is satisfied if one of the conspirators caused tortious injury in Delaware by an act in this state because the other conspirators are then deemed to

have committed that act through an agent within the meaning of the statute.[193]

But, the insurmountable problem for the Stockholder Plaintiffs here is that their 211–page Complaint does not allege a single act in Delaware in furtherance of the fraudulent schemes that the Complaint details. Lacking an act in Delaware by a co-conspirator that can be imputed to the Employee Defendants, the Stockholder Plaintiffs have failed to articulate a viable statutory basis for this court's exercise of personal jurisdiction over these defendants.[194] Thus, the claims against

whether a person has committed acts satisfying § 3104 'through an agent.' ").

190. *See, e.g., Hercules,* 611 A.2d at 481 (sustaining jurisdiction where the conspiracy theory was used in conjunction with § 3104(c)(3)).

191. 10 *Del. C.* § 3104(c)(3) (emphasis added).

192. *See Hercules,* 611 A.2d at 481 ("It is not an arcane concept that conspirators are considered agents for jurisdictional purposes.").

193. *See Chandler v. Ciccoricco,* 2003 WL 21040185, at *8 (Del.Ch. May 5, 2003) ("[A]ll of the members of a conspiracy may be subjected to personal jurisdiction under § 3104 if one of the co-conspirators, acting in furtherance of the conspiracy, committed an act sufficient to invoke long-arm jurisdiction.").

194. For the first time in their sur-reply brief, the Stockholder Plaintiffs contend that jurisdiction exists under 10 *Del. C.* § 3104(c)(4). That provision provides jurisdiction over an individual "who in person or through an agent ... (4) [c]auses tortious injury in the State or outside the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State." 10 *Del. C.* § 3104(c)(4). The Stockholder Plaintiffs claim that because Marsh & McLennan, Gen Re, and defendant ACE USA, an a ACE subsidiary, are all Delaware corporations, they regularly do business in Dela-

ware, and thus are subject to jurisdiction under § 3104(c)(4). The Stockholder Plaintiffs further assert that, because there is jurisdiction over those corporate defendants, there is necessarily jurisdiction over their alleged co-conspirators, the Employee Defendants. This argument is not fairly presented. The Stockholder Plaintiffs made no such argument in their answering brief. Indeed, the Stockholder Plaintiffs affirmatively represented in their answering brief that they were not relying upon § 3104(c)(4) as a basis for personal jurisdiction over the Employee Defendants. Ans. Br. at 53 n. 21 ("Plaintiffs do not predicate personal jurisdiction over [Castelli, Radke, and Milton] on 10 *Del. C.* § 3104(c)(4).... Rather, as set forth herein, sufficient grounds exist for the Court to exercise jurisdiction over all Personal Jurisdiction Movants pursuant to Delaware's specific jurisdiction statute, 10 *Del. C.* § 3104(c)(3)."). The Stockholder Plaintiffs have thus waived this argument. *See In re IBP, Inc. S'holders Litig.,* 789 A.2d 14, 62 (Del.Ch.2001) (holding that an argument was waived because it was not included in a party's opening post-trial brief). And, even if they had not waived the argument, the Stockholder Plaintiffs have not convinced me that § 3104(c)(4) permits the exercise of personal jurisdiction over the Employee Defendants. The use of the conspiracy theory has traditionally worked because of the general rule that co-conspirators are agents of one another. *See, e.g., Hercules,* 611 A.2d at 481 (noting that "conspirators are considered agents for jurisdictional purposes"). But a co-conspirator is only an agent when she acts in furtherance of con-

them are dismissed without prejudice.[195]

### H. *New York Law Bars The Claims Against PWC*

Finally, I address the motion to dismiss brought by PWC. The Complaint alleges that PWC committed malpractice, that as a result of that malpractice the fraudulent schemes at AIG were not timely discovered and rectified, and that AIG suffered more grievous harm than would have been the case had PWC lived up to Generally Accepted Audit Standards ("GAAS"). PWC argues that a New York variation of the *in pari delicto* doctrine bars the malpractice claim and a substantively similar breach of contract claim the Stockholder Plaintiffs assert against it. This New York rule immunizes an auditor if its client had top-level managers who knew of or

participated in the financial wrongdoing that gave rise to the errors in the financial statements that the auditor certified as GAAP-compliant.[196] And, it applies to immunize an auditor even if the auditor's fulfillment of its professional duty of care would have resulted in the detection of the underlying fraud and the avoidance of harm to its client.[197]

The Stockholder Plaintiffs respond obliquely to this argument. I say obliquely because they largely avoid engaging PWC regarding the appropriate choice of law to apply to the claims against PWC. The Stockholder Plaintiffs then seek to ground the survival of their claims against the PWC in the application of the law of states other than New York.

spiracy. *See Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2005 WL 5757654, at *7 (Del.Ch. Mar.3, 2005) (noting that the conspiracy theory is based on "policies that make conspirators liable for the acts of their co-conspirators in furtherance of a conspiracy"). The Stockholder Plaintiffs are trying to conflate the very legal existence of some co-conspirators—Marsh & McLennan, ACE USA, and Gen Re—with that of the Employee Defendants. There are situations when the separate legal existence of persons is disregarded for personal jurisdiction purposes, such as when a subsidiary's veil is pierced because the subsidiary effectively has no substantial claim to call itself a person different from its parent. *HMG/Courtland*, 729 A.2d at 307 ("Our courts have also applied the alter ego theory rather strictly, using an analysis similar to those used in determining whether to pierce the corporate veil."). But, veil piercing and other similar theories depend on the notion that the legal person present in Delaware is not in fact separate from the person over whom jurisdiction is asserted. They are deemed one in the same, usually on the notion that the subsidiary in Delaware is in fact the parent itself improperly cloaked in a different name. Marsh & McLennan, ACE USA, and Gen Re are large corporations with diverse operations, and it is untenable in my view to impute their identity as Delaware residents to the Employee Defendants.

**195.** It is also not appropriate to give the Stockholder Plaintiffs the benefit of jurisdictional discovery so they can fish for a possible basis for this court's jurisdiction. Before ordering personal jurisdiction discovery there must be at least "some indication that this particular defendant is amenable to suit in this forum." *Hansen v. Neunueller GmbH*, 163 F.R.D. 471, 475 (D.Del.1995). Despite having years to refine their Complaint, the Stockholder Plaintiffs cannot point to any basis upon which this court might have jurisdiction over the Personal Jurisdiction Defendants. Without a non-frivolous ground for jurisdiction, jurisdictional discovery is not appropriate.

**196.** *E.g., Bullmore v. Ernst & Young Cayman Islands*, 20 Misc.3d 667, 861 N.Y.S.2d 578, 582–83 (Sup.Ct.2008); *Capital Wireless Corp. v. Deloitte & Touche*, 216 A.D.2d 663, 627 N.Y.S.2d 794, 797 (1995); *In re CBI Holding Co.*, 529 F.3d 432, 447 (2d Cir.2008); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 101 (2d Cir.2003); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir.1995); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir.1991).

**197.** *E.g., Bullmore*, 861 N.Y.S.2d at 582–83; *Capital Wireless*, 627 N.Y.S.2d at 797; *CBI Holding*, 529 F.3d at 447; *Bennett Funding Group*, 336 F.3d at 101; *Hirsch*, 72 F.3d at 1094; *Wagoner*, 944 F.2d at 120.

As I next explain, I conclude that the malpractice and breach of contract claims against PWC are governed by New York law. I then conclude that PWC is correct about the immunity that New York appears to afford auditors in situations like this. I reach that conclusion reluctantly, because I do not believe that this rule of auditor immunity is, in the blunt manner in which it has been adopted, a sound one, and I expressly avoid any indication that the rule is one that Delaware law embraces. But, the weight of available New York authority suggests that this rule of auditor immunity is the law of New York. Thus, despite the fact that PWC was paid to use its professional skill in accordance with GAAS to ensure that AIG's financial statements were prepared properly and to be alert to the possibility that the management of its client might engage in fraud,[198] New York law bars any claim against PWC for any professional failures in this regard, even if those failures amounted to gross negligence. Therefore, New York law mandates that I dismiss the claims against PWC. I now explain this conclusion in more detail.

### 1. *New York Law Applies To PWC's Conduct*

In resolving PWC's motion to dismiss, I must first make a determination of what state's law applies to the claims against PWC. Those claims are straightforward and related. PWC allegedly breached its contractual duties to AIG because it was contractually required to comply with GAAS in performing its duties and failed to do. The malpractice count is similar,

and alleges that PWC acted negligently by failing to meet the professional standards expected of an auditor. According to PWC, New York applies to these claims because PWC performed most of its audit work through its New York office, which is in the same city where AIG was headquartered, and because PWC signed its audit opinions for AIG in New York.

In a rather weak attempt to avoid. New York law, the Stockholder Plaintiffs assert that PWC's liability relates to the internal affairs of a Delaware corporation and thus is governed by our law under the internal affairs doctrine. But, the internal affairs doctrine, although potent, has very specific applications. That "doctrine governs the choice of law determinations involving matters *peculiar* to corporations, that is, those activities concerning the relationships *inter se* of the corporation, its directors, officers and shareholders." [199] Although PWC's role as an auditor relates to the internal affairs of the corporation, PWC was still a contractual agent employed by AIG to carry out certain contractual duties rather than a part of AIG. PWC's role in helping AIG's board ensure that the corporation prepared accurate books and records and maintained adequate internal controls is an important one to corporate stockholders and other corporate constituencies, but a simple appeal to the internal affairs doctrine does not suffice to allow Delaware to impose its law on claims of any possible nature brought against the auditor, or any other third-party contractor, of a Delaware-chartered corporation. Rather, as our own Supreme Court has instructed,

---

198. American Institute of Certified Public Accountants, Codification of Statements on Auditing Standards § 110.02 (1972) (requiring that an auditor "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material

misstatement, whether caused by error or fraud").

199. *Draper v. Paul N. Gardner Defined Plan Trust*, 625 A.2d 859, 865 (Del.1993) (quoting *McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del.1987) (emphasis in original)).

this court must determine choice of law questions like these by applying the traditional choice of law rules.[200]

■ Under our law, such choice of law questions are governed by the most significant relationship test of the Restatement (Second) of Conflict of Laws.[201] I assume our Supreme Court has called on our courts to apply the Restatement principles precisely so as to promote consistency among the states and avoid unnecessary clashes of interest, where that can be sensibly achieved.[202] I therefore approach the application of the Restatement with that goal in mind, which leads me to give deference to the official commentary to the Restatement even when that commentary might advocate an approach that, while rational, is not one that this court might adopt in the first instance if it were crafting the Restatement itself.[203] In other words, I take the need to apply the Restatement faithfully regardless of whether it always points in the direction that this court might find optimal as a necessary cost of accepting the Restatement and the predictability it provides to parties seeking to understand their legal obligations before disputes arise.[204] This consideration is important because the Restatement uses factors of such plasticity that it is possible to apply them on their face to a similar problem and reach divergent outcomes in a linguistically plausible manner.[205]

But, what I believe our Supreme Court rightly expects is that our state's trial courts will try to apply the Restatement consistent with its official commentary and the weight of reasoned precedent following the Restatement.[206] Using that approach,

---

**200.** *See VantagePoint Venture Partners 1996 v. Examen, Inc.,* 871 A.2d 1108, 1113 n. 14 (Del.2005) ("The internal affairs doctrine does not apply where the rights of third parties external to the corporation are at issue, *e.g.,* contracts and torts.").

**201.** *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 46–47 (Del.1991) (holding that the Restatement's most significant relationship test governs tort claims); *Playtex Family Prods., Inc. v. St. Paul Surplus Lines Ins. Co.,* 564 A.2d 681, 688 (Del.1989) (determining that Delaware has adopted the Restatement's most significant relationship test in cases of contract claims).

**202.** In adopting the Restatement's test, our Supreme Court emphasized that "a majority of the states abandoning *lex loci* have adopted the Restatement rule." *Travelers,* 594 A.2d at 47.

**203.** *Cf., Turner v. Lipschultz,* 619 A.2d 912, 916 n. 6 (Del.1992) (using RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 146 cmt. d (1971)); *VantagePoint,* 871 A.2d at 1113 n. 13 (applying RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 303 cmt. d).

**204.** This concern is enshrined in the Restatement itself, which explicitly recommends that judges consider "certainty, predictability and uniformity of result" as well as "the protection of justified expectations." RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 6(2).

**205.** In that vein, consider the general factors the Restatement says are relevant to choice of law determinations:
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
*Id.* I think it obvious that a skilled jurist could mold these in many ways.

**206.** The Delaware Supreme Court has also used these comments in deciding questions under the Restatement. *See, e.g., Turner,* 619 A.2d at 916 n. 6 (using RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 146 cmt. d); *VantagePoint,* 871 A.2d at 1113 n. 13 (applying RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 303 cmt. d).

courts create the best chance to promote predictability.

Here, therefore, I hew to that approach and focus on the specific claims the Stockholder Plaintiffs make, which are for professional negligence and breach of contract. In the case of a tort like professional malpractice, the Restatement considers the following factors the most relevant:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.[207]

Similarly, in a breach of contract action the Restatement considers:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.[208]

In accordance with the precedent of this state, I do not simply add up the number of contacts in applying these factors, but instead weigh them in the unique circumstances of the case at hand.[209]

Here, the relevant factors point mostly toward New York. In coming to that conclusion, I am somewhat hampered by the procedural posture of this case. The Complaint avoids any fact pleading about where PWC did its work for AIG, and the Stockholder Plaintiffs stress that AIG is a Delaware corporation and that PWC is a Delaware limited liability partnership.[210]

But, a fair reading of the Complaint and the documents it incorporates indicates that PWC performed most of its audit services in New York, and performed no acts in Delaware that are relevant to the claims against it. In particular, PWC signed its audit letters relating to the financial statements that were later restated in New York.[211] And, although it is a multinational company with offices around the world, AIG maintains its "principal executive office" in New York City.[212] Notably, the Complaint is filled with details regarding how involved in the fraudulent schemes AIG's top managers were, managers who worked out of AIG's headquarters. It is fairly inferable given where the audit letters were signed and where most of the fraudulent conduct occurred that most of PWC's work was also done in that same state, which is New York. Indeed, the only fair inference is that PWC performed

---

207. RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 145(2).

208. *Id.* § 188(2).

209. *Travelers*, 594 A.2d at 48 n. 6 ("[T]he Restatement test does not authorize a court to simply add up the interests on both sides of the equation and automatically apply the law of the jurisdiction meeting the highest number of contacts . . . .").

210. Compl. ¶¶ 108, 174.

211. AIG 1999 Annual Report at 42; AIG 2000 Annual Report at 43; AIG 2001 Annual Report at 48; AIG 2002 Annual Report at 60. Each of AIG's annual reports from 1996 to 2005 have been expressly incorporated into the Complaint. Compl. at 20 n. 4 ("Each of [AIG's] Form 10–K, 10–Q and Schedules 14A for the years 1996 through 2005, inclusive, are incorporated by reference herein. AIG's March 30, 2005 and May 1, 2005 press releases are also incorporated by reference herein.").

212. Compl. ¶ 108.

most of its work in New York or somewhere other than Delaware, as the Complaint alleges no actions of any kind in Delaware.

For both torts like negligence and for breach of contract claims, the Restatement gives substantial weight to the place of performance of the acts that were negligent or that breached the contract. Those factors both favor New York, and so does the related factor of where the relationship between AIG and PWC was centered. Moreover, factors like the place of contracting or negotiation do not favor Delaware, as the Stockholder Plaintiffs fail to allege that PWC and AIG contracted or negotiated in Delaware. Indeed, given what is pled in the Complaint, it seems probable that those factors would, after discovery, also tilt the analysis toward New York.

The applicability of New York law under the Restatement's test is also reinforced by the fact that, to the extent the place of AIG's injury or its domicile are relevant, those questions favor the application of New York law. In this regard, the Restatement is, to my mind, more than a bit outmoded in the weight it gives to the physical in its examination of these factors. That is, the Restatement cares more about where a corporation has physical assets

than about where the corporation is centered from the perspective of those most interested in its financial health—its investors and creditors. Thus, the commentary to the Restatement indicates that a corporation's principal place of business is a more important connection than the corporation's state of incorporation for determining both where a corporation is domiciled and where the injury to a corporation occurs.[213] Regardless of whether a reasonable mind can quibble with that approach, it is the Restatement's approach and the Restatement is what this court is bound to follow. Moreover, even if one were to deem an injury to have occurred to AIG in Delaware, one could not deny that AIG also suffered an injury in New York. In some genuine sense, financial injuries of the kind at issue here are suffered by AIG wherever it is present.

Taken together, the Restatement factors therefore tilt in favor of New York. Importantly, to my mind, other courts that have addressed similar situations when corporations have sued outside professionals for malpractice or breach of contract have normally read the Restatement as requiring the application of the law of the state where the work was performed when that is also the state where the corporation was headquartered.[214] The trend of the au-

---

213. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 145 cmt. e ("At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation."); *id.* § 145 cmt. f; *see also UbiquiTel Inc. v. Sprint Corp.,* 2005 WL 3533697, at *3 (Del.Ch.2005) ("[T]he Conflicts Restatement observes that where, as here, the injury complained of is the loss of customers or trade, '[t]he effect of the loss, which is pecuniary in its nature, will normally be felt most severely at the plaintiff's headquarters or principal place of business.'" (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. f)). The rule is the same for determining a corporation's domicile when applying the Restatement to contracts. RE-

STATEMENT (SECOND) OF CONFLICTS OF LAWS § 188 cmt. e.

214. *See, e.g., Baena v. KPMG LLP,* 389 F.Supp.2d 112, 117 n. 4 (D.Mass.2005) (applying Massachusetts law to a claim brought on behalf of a Delaware corporation under Delaware conflict of law rules because Massachusetts was where the company was headquartered and where the audit was performed), *aff'd,* 453 F.3d 1 (1st Cir.2006); *Grant Thornton LLP v. Suntrust Bank,* 133 S.W.3d 342, 361 (Tex.App.2004) (applying Texas law to a suit against an auditor of a Delaware corporation because, among other contacts, Texas was where the audit was conducted, where the statement containing the

thority in that direction is not entirely surprising, as it is consistent with the notion that professionals practicing in a certain state should be able to practice in reliance upon the law of that state.[215] This is not to say that there is not an argument that the practice of auditing public companies that are chartered by another state should subject the auditor to the responsibility to answer to the laws of the chartering state, it is only to admit that the trend of the authority toward using the law of the state where the professional did its work when that location coincided with the corporation's headquarters is defensible.

That said, I confess to being troubled by the implications that, as will soon be seen, result from the application of New York law. To my mind, Delaware has a substantial policy interest in protecting investors in its corporations, as well as the other constituencies—such as providers of debt capital—vital to corporate success. This policy interest is, in my view, implicated by the question of whether the corporation may hold its auditors accountable for meeting their professional obligations to the firm. Indeed, as we shall see, the New York law immunizing auditors is itself in part inspired by views about the respective responsibility of corporate directors and company auditors for using due care to detect fraud by insiders. Arguably, the state of incorporation that ad-

dresses the internal affairs of the corporation has a more important policy interest than the state where the corporation is headquartered and the auditors performed their work. If the outside auditor's fulfillment of its important gatekeeping duties is, as I think, important to ensuring that Delaware corporations comply with their legal duties and conduct their affairs in a way that advances their investor's interests, it is troubling to think that another state's law could render an auditor immune from accountability.[216]

These considerations are on my mind as I turn to the final step in the choice of law analysis. Having applied the Restatement's tort- and contract-specific considerations, I must apply § 6 of the Restatement, which entitles me to consider general policy issues, including Delaware's public policy and the unique nature of accountants for public corporations in making my choice of law determination.[217] It is frankly tempting to give heavy weight to this factor and slight the Restatement's emphasis on physical location in addressing contract and negligence claims. But, to give into that temptation would undercut the predictability that should flow from use of the Restatement. Although the Restatement may be outmoded, its directional guidance is not un-

alleged misrepresentations was prepared, and where the company in question was headquartered).

**215.** *See Greenberg Traurig of New York, P.C. v. Moody,* 161 S.W.3d 56, 74 (Tex.App.2004) (applying New York law as opposed to Texas law to claims that New York lawyers acted negligently in part because "the New York lawyers involved in these transactions would have had no reasonable expectation that Texas law would govern their conduct.").

**216.** *See generally* John C. Coffee, *Gatekeeper Failure and Reform: The Challenge of Fash-*

*ioning Relevant Reforms,* 84 B.U. L.REV. 301 (2004) (discussing the importance of gatekeepers in preventing financial and accounting problems); John C. Coffee, *Understanding Enron: "It's About the Gatekeepers, Stupid,"* 57 BUS. LAW. 1403 (2002) (same).

**217.** *McBride v. Whiting–Turner Contracting Co.,* 625 A.2d 279 (table), 1993 WL 169110, at **3–4 (Del.1993) (emphasizing the importance of looking to the § 6 factors in addition to those enumerated in Restatement sections dealing with specific types of claims).

clear and it points to our sister state, New York.

In reaching this conclusion, however, I will make one important caveat. Had the Stockholder Plaintiffs accused PWC of aiding and abetting breaches of fiduciary duty, my choice of law determination might be quite different. Under Delaware law, a complaint for aiding and abetting a breach of fiduciary duty can only be sustained if the pled facts support an inference that the defendant knowingly helped a fiduciary breach her fiduciary duties.[218] If the Complaint stated a claim that PWC was a knowing accomplice in serious breaches of fiduciary duty injuring a Delaware corporation, Delaware's policy interest would, it seems to me, be paramount. Although another state might have a policy interest in applying its own standards of professional accountability to auditors practicing within its borders, it is difficult to see how such a state could exculpate an auditor for knowing complicity in a breach

of fiduciary duty against a Delaware corporation and trump Delaware's interest in holding the auditor accountable for its purposeful wrongdoing.[219] In other words, it would be more difficult for Delaware to give way if the professional is alleged to have been a knowing accomplice in a scheme to injure a Delaware corporation than when a professional is only accused of failing to live up to professional standards.[220]

Because PWC only faces claims for malpractice and breach of contract, rather than claims that it consciously aided wrongful managerial misconduct, I apply New York law to the claims against it.

## 2. New York Law Makes PWC Immune From The Stockholder Plaintiffs' Claims

Having determined that New York law applies, I must apply the *in pari delicto* doctrine as the New York Court of Appeals likely would.[221] In a situation like

218. *See Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *15 (Del.Ch. Nov.30, 2007) ("Under Delaware law, a valid claim for aiding and abetting a breach of fiduciary duty requires: (1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary."); *see also Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del.Ch.2006) (noting that aiding and abetting claims are essentially civil conspiracy claims brought in the context of matters relating to the internal affairs of corporations).

219. *See Rogers v. Guar. Trust Co. of N.Y.*, 288 U.S. 123, 130, 53 S.Ct. 295, 77 L.Ed. 652 (1933) ("It has long been settled doctrine that a court—state or federal—sitting in one state will, as a general rule, decline to interfere with, or control by injunction or otherwise, the *management of* ... [a] corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of the domicile.").

220. *Cf. Sample v. Morgan*, 935 A.2d 1046, 1063–64 (Del.Ch.2007) (holding that personal jurisdiction over lawyers who allegedly aided and abetted the breach of a fiduciary duty to a publicly-traded Delaware corporation did not violate the Due Process Clause in part because of Delaware's important interest in the internal affairs of its corporations and the lawyer's important role as corporate counsel to ensure the board's compliance with its legal and equitable duties).

221. *See Monsanto Co. v. C.E. Heath Comp. & Liab. Ins. Co.*, 652 A.2d 30, 35 (Del.1994) (engaging in an inquiry into what rule the Missouri Supreme Court would adopt and thus suggesting that when a Delaware court must use another state's law and when that law is uncertain, the Delaware Court should try to reach the conclusion that the other state's highest court likely would); *see also Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 177, 61 S.Ct. 176, 85 L.Ed. 109 (1940) (requiring a federal court in a diversity case to address an uncertain principle of state law by predicting how the state's highest court would likely answer the question).

this one, where the New York Court of Appeals has not spoken definitively on the question at hand, I must consider the available precedent from other courts applying New York law, and come to a reasoned prediction about how the New York Court of Appeals would decide this motion. In this predictive process, I note the strong weight New York State courts give to federal court rulings applying New York law, particularly those of the U.S. Court of Appeals for the Second Circuit.[222]

 New York has embraced a very strong version of *in pari delicto* doctrine, which bars one tortfeasor from suing another tortfeasor for harm the first tortfeasor suffered because of their joint wrongdoing.[223] This doctrine is based, in part, on the notions that courts should not have to sum up accounts between wrongdoers engaged in an illegal enterprise.[224]

 In this context, *in pari delicto* comes into play because of agency principles that are traditionally used to hold a corporation liable for acts of its directors, officers, employees, and agents. Agency law imputes employees' official misconduct (or torts committed in the course of busi-

ness) to the corporation.[225] Under that traditional principle, a corporation can be held liable for wrongful acts of its directors and officers on behalf of the corporation that injure third parties.[226]

 New York and many other states use these same agency law principles in cases where the corporation seeks to sue other parties who allegedly conspired with corporate insiders in committing tortious or illegal acts in their official capacities. Because the corporation is deemed to have known what its directors and officers knew, if any of those directors and officers committed a wrong, the corporation is deemed to have known about and approved that act.[227] Thus, the wrongdoing is imputed to the corporation, and third-parties alleged to have conspired with the corporate insiders in the wrongdoing may raise the defense of *in pari delicto*. Specifically, New York law presumes " 'that an agent [will normally] discharge [ ] his duty to disclose to his principal all the material facts coming to his knowledge with reference to the subject of his agency,' and thus any misconduct engaged in by a manager is with—at least— his corporation's tacit consent."[228] Ac-

**222.** *See, e.g., Bullmore v. Ernst & Young Cayman Islands,* 20 Misc.3d 667, 861 N.Y.S.2d 578 (Sup.Ct.2008) (using Second Circuit opinions on *in pari delicto* to resolve a question under New York law).

**223.** *See Haynes v. Rudd,* 102 N.Y. 372, 7 N.E. 287, 290 (1886) (barring a contract action because the plaintiff was *in pari delicto* ); *Landley v. Fischer,* 226 A.D. 352, 235 N.Y.S. 368, 369–70 (1929) (holding that a plaintiff could not sue a defendant for fraud because they were *in pari delicto* ).

**224.** *See Higgins v. McCrea,* 116 U.S. 671, 686, 6 S.Ct. 557, 29 L.Ed. 764 (1886) (applying *in pari delicto* because courts should not give their help to wrongdoers); *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (explaining that *in pari delicto* has its roots in

deterrence and the principle that courts should not have to adjudicate disputes between wrongdoers).

**225.** *Prudential–Bache Sec., Inc. v. Citibank, N.A.,* 73 N.Y.2d 263, 539 N.Y.S.2d 699, 706, 536 N.E.2d 1118 (1989) ("A legal entity, of course, necessarily functions through human actors—its officers, agents and employees— whose knowledge and conduct may be imputed to the entity under the doctrine of respondeat superior.").

**226.** *Id.*

**227.** *In re CBI Holding Co.,* 529 F.3d 432, 447 (2d Cir.2008).

**228.** *Id.* at 448 (quoting *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 497 N.Y.S.2d 898, 488 N.E.2d 828, 829 (1985)).

cordingly, if imputation applies, AIG is deemed to have participated in its directors', officers', and employees' fraudulent schemes and AIG is deemed to have been as or more guilty of wrongdoing than its auditor, PWC, AIG is barred from recovering against PWC.[229]

The New York Court of Appeals has applied these principles of imputation firmly, subject only to a narrow exception where "the agent [has] totally abandoned his principal's interests and [is] acting *entirely for his own or another's purposes*."[230] Termed the "adverse interest exception," this carve out is an extremely narrow one. "It cannot be invoked merely because [an agent] has a conflict of interest or because he is not acting primarily for his principal."[231] As a result, New

York courts have stated that knowledge is imputed as long as a corporation benefited "to any extent" from an agent's actions.[232]

The U.S. Court of Appeals for the Second Circuit has had a major influence in shaping the current New York approach to *in pari delicto,* under the *Wagoner*[233] line of cases. This line of cases refashions the *in pari delicto* doctrine into a rule of standing, and the Second Circuit has broadly framed the *Wagoner* rule as barring a corporation from bringing "[a] claim against a third party for defrauding a corporation with the cooperation of management."[234] This line of cases was, in turn, heavily influenced by a Seventh Circuit decision, *Cenco Inc. v. Seidman & Seidman.*[235] *Cenco* is a free-ranging opinion,

**229.** *Capital Wireless Corp. v. Deloitte & Touche,* 216 A.D.2d 663, 627 N.Y.S.2d 794, 797 (1995) (holding that a malpractice claim against an auditor could not be made if imputation would impute knowledge of the fraud onto the corporation); *see also Wight v. BankAmerica Corp.,* 219 F.3d 79, 87 (2d Cir.2000) (holding under New York law that "[b]ecause management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in" (citations omitted)).

**230.** *Hampton Affiliates,* 497 N.Y.S.2d 898, 488 N.E.2d at 830 (emphasis added).

**231.** *Id.*

**232.** *Bullmore,* 861 N.Y.S.2d at 582; *see also Hampton Affiliates,* 497 N.Y.S.2d 898, 488 N.E.2d at 830 (holding that to come within the adverse interest exception the agent must have totally abandoned her principal's interest, a mere conflict of interest is not enough); *Cobalt Multifamily Investors I, LLC v. Shapiro,* 2008 WL 833237, at *4 n. 10 (S.D.N.Y. Mar.28, 2008) (holding that as a matter of New York law "where a corporation benefits to *any* extent from the fraudulent acts of its agents, the agents cannot be said to have 'totally abandoned' the interests of the corporation" (emphasis in original)).

**233.** *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir.1991).

**234.** *Id.* at 120. In line with *Wagoner,* many of the relevant cases discuss the current issue as one of standing. This is because standing must be addressed before reaching the question of whether the affirmative defense of *in pari delicto* applies. *See In re CBI Holding, Co.,* 311 B.R. 350, 373 (S.D.N.Y.2004), *aff'd in part, rev's in part,* 529 F.3d 432 (2d Cir. 2008). But, *in pari delicto* apparently still exists as a separate rule. Courts applying New York law have indicated that the analysis involved is similar with the exception that *in pari delicto* requires that a court determine whether the defendant was more at fault. *See In re Grumman Olson Indus., Inc.,* 329 B.R. 411, 424 n. 5 (Bankr.S.D.N.Y.2005); *In re Parmalat Sec. Litig.,* 477 F.Supp.2d 602, 609 n. 45 (S.D.N.Y.2007) (noting that the *Wagoner* rule "is thus quite similar to that of *in pari delicto,* but *Wagoner* is a rule of standing, rather than a defense to liability").

**235.** 686 F.2d 449 (7th Cir.1982); *see, e.g., CBI Holding,* 529 F.3d at 448 (citing *Cenco* for the proposition that "a bankruptcy trustee does not have standing to bring any claims related to professional malpractice in the context of cooperative wrongdoing between the debtor and its auditors"); *Bullmore,* 861 N.Y.S.2d at 583–585 (citing and discussing *Cenco* ).

which at bottom is rested on the notion that:

> Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims; their equities vis-a-vis a careless or reckless auditor are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud. Maybe not net beneficiaries, after the fraud is unmasked and the corporation is sued—that is a question of damages, and is not before us. But the primary costs of a fraud on the corporation's behalf are borne not by the stockholders but by outsiders to the corporation, and the stockholders should not be allowed to escape all responsibility for such a fraud, as they are trying to do in this case.[236]

Following this judgment in applying agency principles and *Wagoner*, the New York courts have imputed the knowledge of faithless directors, officers, and employees even where the corporation had independent directors and there is no evidence that the wrongdoer brought the fraud to the independent directors' attention.[237] In that regard, the recent trend of New York law has been strongly against the adoption of a so-called innocent insider exception, which would limit the use of the *in pari delicto* doctrine in a situation where there were independent directors without knowledge of the wrongdoing.[238] The Stockholder Plaintiffs have cited no New York authority suggesting that the New York Court of Appeals would buck this strong trend.

And, critically for AIG's claims, New York courts have consistently applied the *in pari delicto* doctrine to bar claims against auditors in situations where the auditors failed to detect or expose fraud committed by top corporate managers.[239]

**236.** *Cenco*, 686 F.2d at 456.

**237.** *See, e.g., Bullmore*, 861 N.Y.S.2d at 583–584; *see also American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 233 F.R.D. 327 (S.D.N.Y.2004) (barring claim under Wagoner despite the presence of an innocent "principal" of the corporation). According to a New York court, the policy reasoning behind this is that "it is more important to encourage management to choose carefully and then manage its agents. Imputation of agent misconduct to innocent managers accomplishes this goal." *Morgado Family Partners, LP v. Lipper*, 2004 WL 3142198, at *5 (N.Y.Sup.Ct.2004), *aff'd*, 19 A.D.3d 262, 800 N.Y.S.2d 128 (2005).

**238.** *See CBI Holding*, 311 B.R. at 373 ("Thus, unless the adverse interest exception to the presumption of imputation applies, it is immaterial whether innocent insiders exists; the agent is still acting on behalf of the company, and his actions will be imputed to the company notwithstanding the existence of those innocent insiders."), *rev'd on other grounds*, 529 F.3d 432, 447 n. 5 (2d Cir.2008) (although the Second Circuit did not reach the question of the innocent insider exception itself, it noted that the lower court's analysis of the issue was "extremely persuasive"). Several recent New York cases addressing the innocent insider doctrine chose to avoid expressly ruling on whether the doctrine had been adopted in New York. *See Bullmore*, 861 N.Y.S.2d at 583; *Morgado*, 2004 WL 3142198, at *5 ("In discussing the 'innocent insider' and 'sole actor' rules, the court does not endorse either as being a statement of New York law."); *see also American Tissue*, 233 F.R.D. at 329–30 (citing a lack of "binding authority in support of the legal viability of [the] 'innocent insider' theory.").

**239.** *See Capital Wireless*, 627 N.Y.S.2d at 797–798 (applying standard imputation rules to a claim against an auditor in finding that there was a triable issue of fact); *Bullmore*, 861 N.Y.S.2d at 582–85 (applying the adverse interest exception to claims against an auditor). Courts applying New York law have also regularly applied imputation to claims against auditors. *See Bennett Funding Group*, 336 F.3d at 101 (barring claims by a bankruptcy

In taking that approach, these decisions appear to have been heavily influenced by the Seventh Circuit's free-wheeling opinion in *Cenco*, which is essentially based on the notion that immunizing auditors from malpractice claims, even in situations where the auditor's compliance with professional standards might have helped catch the fraud and limit the harm to the corporation, is good policy because it incentivizes independent directors and even stockholders to be effective monitors of managerial behavior.[240] *Cenco* thus simplifies the complexity in statements such as this one:

> From the standpoint of deterrence, the question is whether the type of fraud that engulfed Cenco between 1970 and 1975 will be deterred more effectively if Cenco can shift the entire cost of the fraud from itself (which is to say, from its stockholders' pockets) to the independent auditor who failed to prevent the fraud. We think not.[241]

*Cenco* even blithely takes the same position as to conscious auditor participation in the fraud.[242]

Although the New York Court of Appeals has itself never addressed the application of the *Wagoner* line of cases to a claim against an auditor like PWC, the New York cases that do exist have consistently applied this law to claims against auditors in these circumstances, and the Stockholder Plaintiffs have not cited to any decision under New York law which suggests that the New York Court of Appeals would take a different position than the decisions reached by state trial courts in New York and by federal courts applying New York law. Rather, the New York courts have warmly embraced *Wagoner* and the *Cenco* approach, and have moved away from embracing an innocent insider exception.

Therefore, unless the Complaint pleads facts that give rise to a reasonable inference that all of the AIG insiders had totally abandoned AIG's interests and that the narrow adverse interest exception applies, I must dismiss the claims against PWC.

Although the Stockholder Plaintiffs argue that the Complaint contains facts supporting the applicability of the adverse interest exception, that argument is not supported by the Complaint itself. Even read in the most plaintiff-friendly way, the Complaint contends that the fraud was not implemented solely to benefit the insiders committing it. No doubt many of the AIG insiders stood to reap indirect personal benefits if AIG's stock price stayed artificially high or if AIG reaped revenue from selling questionable income-smoothing products, receiving its healthy share of rigged bids, or secretly buying up elderly people's insurance policies. And, although

---

trustee against an allegedly negligent auditor); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir.1995) (holding that a corporation cannot sue an auditor for committing fraud in cooperation with the corporation's employees). In extending this doctrine to auditors by rote, New York makes a jump that New Jersey recently rejected. *See NCP Litig. Trust v. KPMG LLP*, 187 N.J. 353, 901 A.2d 871, 879–80 (2006) (declining to apply imputation in a suit against an auditor because "the rationale for imputation in a simple principal-agent relationship begins to break down in the context of a corporate audit where the allocation of risk and liability among principals, agents, and third parties becomes more complicated").

**240.** *Cenco*, 686 F.2d at 455.

**241.** *Id.* This articulation ignores all nuance and several alternatives to avoiding an unreasonably harsh treatment of the auditors.

**242.** *Id.* at 453 (holding that a claim against an auditor for negligence and breach of contract in failing to detect fraud is the same as a claim for being an active accomplice in the fraud and thus governed by what is essentially one defense).

some courts applying New York law have arguably strained logic and linguistics to avoid applying the adverse interest exception faithfully, this court must apply the test as it has been articulated by the New York Court of Appeals.[243] As indicated, that exception only applies when the corporate insiders have acted entirely for their own benefit and without any intention to benefit the corporation. That is not the situation that existed here. The pled facts do not support any inference except that Greenberg and his subordinates wanted AIG to benefit in the first instance from the misconduct, and that they would derive their gains from those reaped by AIG, in the form of higher actual revenues, higher reported earnings, and a higher stock price.

■ Thus, the Complaint is replete with ways in which AIG itself can be thought to have benefited from the fraudulent schemes, even if those benefits turned out to be short-lived once the fraud was discovered. For example, the Complaint alleges that the manipulation of AIG's loss reserves in the Gen Re transaction may have been done to keep AIG's stock price high, so that AIG could use that acquisition currency "to more cheaply acquire an unrelated insurance company."[244] Similarly, by engaging in the various accounting frauds, the AIG directors were acting to make AIG more attractive to investors. The schemes to avoid taxes temporarily

provided AIG with more money because it had to pay out less cash to various governments. AIG's bid-rigging schemes were done to secure business for AIG. And, AIG sold income-smoothing products to other companies to make money. These efforts ultimately backfired and AIG was exposed to liability that erased any fraudulently crafted appearance of health and forced AIG to pay out fines, but the Complaint does not support any conclusion other than that AIG's directors and officers acted, at least in part, to benefit AIG. In reaching this conclusion, I note that in applying the *in pari delicto* doctrine, New York law does not embrace the notion that any conscious act of a fiduciary causing a corporation to break the law is against the corporation's charter and best interests. In the *in pari delicto* context, what the adverse interest test is directed to is whether the insider is essentially stealing from the corporation as opposed to engaging in improper acts that, even if also self-interested, have the effect of benefiting the corporation financially, even if that benefit rested on illegal accounting or other illicit conduct.

■ Given that the adverse interest exception does not apply, the wrongdoing of AIG's directors, officers, and employees is imputed to AIG and the *in pari delicto* doctrine bars the malpractice and breach of contract claims against PWC.[245] This is

**243.** *See, e.g., CBI Holding,* 529 F.3d at 448–53 (upholding a bankruptcy court's ruling that the adverse interest exception was applicable because it was not clearly erroneous for the bankruptcy court to find that management had misstated the company's financial statements solely out of personal motivation).

**244.** Compl. ¶ 268.

**245.** I also reject the Stockholder Plaintiffs' argument that there is a triable issue as to whether PWC or AIG is more culpable. Even under *in pari delicto,* a party can sue a joint

tort-feasor who was at greater fault. *See Chem. Bank v. Stahl,* 237 A.D.2d 231, 655 N.Y.S.2d 24, 25 (N.Y.App.Div.1997) (noting that *in pari delicto* "requires immoral or unconscionable conduct that makes the wrongdoing of the party against which it is asserted at least equal to that of the party asserting it"). But, under New York law, the fact that the Complaint alleges that AIG acted with scienter is critical. Thus, even if PWC knowingly broke the law too, as a matter of New York law, PWC and AIG would be equally at fault, and suit by AIG would be barred. And,

an outcome dictated by New York law and does not necessarily reflect the outcome

that would be reached if Delaware applied.[246] Accordingly I dismiss the claims

in any event, the Complaint only alleges claims that PWC committed malpractice and broke a contract.

**246.** If Delaware law were applicable, I would be chary about following the New York approach. There are many reasons for this. First, the New York rule conflates, in a simplistic way, related, but separate, questions of agency. There are many situations where the behavior of faithless fiduciaries is imputed to the corporation when the corporation faces liability to innocent third-parties who have dealt with it in good faith. This, of course, has never prevented the corporation from recovering against those faithless fiduciaries in a derivative suit. That is true even if the corporation seeks to recover against an independent director who, by gross negligence, arguably failed to prevent the harm caused by the faithless fiduciaries who acted with scienter in the absence of an exculpatory charter provision. *Cf. Smith v. Van Gorkom*, 488 A.2d 858, 874 (Del.1985) (finding that directors breached their fiduciary duties by acting in a grossly negligent manner when they approved a CEO's plan to sell the company). It is a policy judgment, not some rote conflation of contextually different questions of agency, that must determine whether, like an independent director accused of negligence by a corporation whose top officers knowingly misused their official powers, an auditor should face liability for professional negligence to its client corporation in similar circumstances.

Second, answering that policy question requires a far more nuanced consideration of the auditor's role than was given in the Seventh Circuit's *Cenco* decision. Without simplifying the issue or *in any way* suggesting that auditors can reliably detect high-level financial fraud, one can confidently say that auditors are as well, or arguably even better, positioned than independent directors to do so. Indeed, although auditors give no warranty that they can detect fraud, the requirement for public companies to employ auditors is in large measure inspired by the recognition that corporate insiders have more than rarely been known to engage in financial shenanigans. *See* Amy Shapiro, *Who Pays the Auditor Calls the Tune?: Auditing Regulation and Clients' Incentives*, 35 SETON HALL L.REV 1029, 1035 (2005) ("Whatever the organiza-

tion, all audits have a similar purpose, namely to provide some independent assurance that those entrusted with resources are made accountable to those who have provided the resources." (quoting JOHN ARNOLD ET AL., FINANCIAL ACCOUNTING 19 (2d ed.1994))); Melvyn I. Weiss and Elizabeth A. Berney, *Restoring Investor Trust in Auditing Standards and Accounting Principles*, 41 HARV. J. ON LEGIS. 29, 34 (2004) (observing that federal law mandated that public companies have auditors in order to protect investors from fraudulent financial statements); Sean M. O'Connor, *Be Careful What You Wish For: How Accountants and Congress Created The Problem of Auditor Independence*, 45 B.C. L.REV. 741, 742 (2004) (noting federal securities law first required independent auditors to "counter the temptation for the company to spin the statements for its own ends."); James L. Costello, *The Auditor's Responsibilities for Fraud Detection and Disclosure: Do the Auditing Standards Provide a Safe Harbor?*, 43 ME. L.REV. 265, 271 n. 21 (1991) (setting out how audits were originally designed to uncover fraud and had that principal meaning through the late 1930's); American Institute of Certified Public Accountants, Codification of Statements on Auditing Standards § 316.08 (2002) ("Management has a unique ability to perpetrate fraud because it frequently is in a position to directly or indirectly manipulate accounting records and present fraudulent financial information."). As a result, auditors are considered to have duties not just to management, but to the public at large:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.

*U.S. v. Arthur Young & Co.*, 465 U.S. 805, 817–18, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984) (emphasis in original). The professional standards applicable to public company audits recognize this by requiring that an

auditor "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." American Institute of Certified Public Accountants, Codification of Statements on Auditing Standards § 110.02 (1972). And, federal law explicitly requires that an auditor use "procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts." 15 U.S.C.A. § 78j–1(a)(1).

Furthermore, audit firms are paid sizable fees for the thousands of hours their professionals spend on their duties at each issuer. *See, e.g.,* Compl. ¶ 569 (alleging that AIG paid PWC over $213 million between 2000 and 2004). The audit firm spends many more hours on the task than independent directors do, and are typically far better compensated. Notably, in corporate law, independent directors are entitled to rely in good faith on advice from the auditors that corporate books and records are accurate and GAAP-compliant and that corporate internals controls are adequate. *See* 8 *Del. C.* § 141(e) (protecting a director when she relies on "information, opinions, reports or statements" presented to her by someone she reasonably believes to have "professional or expert competence" in the matter). *Cenco* has this relationship backwards and assumes that as between independent directors and auditors, the former are better positioned to ferret out fraud. *Cenco*, 686 F.2d at 456. Doubtless both groups face challenges in doing so, and, likewise, both are positioned to reduce the risk of fraud in various ways, but I question the soundness of premising a legal rule on the belief that, in a simplistic binary choice, independent directors are better equipped to detect high-level fraud than a company's auditors. I also do not understand why what is, at most, an audit committee's negligence should totally bar the corporation's recovery against a professionally negligent agent. New York, like most states, no longer bars a contributorily negligent plaintiff from recovering. *See* N.Y. C.P.L.R. § 1411 (McKinney 2008). Why should this situation be treated differently? *See NCP*, 901 A.2d at 879–80 (noting that the "imputation defense has been criticized, however, because 'agency doctrines ... operate on an all-or-nothing basis.'" (quoting Deborah A. DeMott, *When is a Principal Charged with an Agent's Knowledge?*, 13 Duke J. Comp Int'l L. 291, 319 (2003))). Certainly, the question deserves a less simplistic answer than *Cenco* and its progeny give.

Third, if auditors are employed, as I think is true, in material part because there is the potential that corporate officials may misuse their powers and commit acts of financial wrongdoing, immunizing auditors in situations when, but for the auditor's professional negligence, wrongful managerial behavior may have been stopped before it resulted in grievous harm relieves the audit firm of any responsibility in one of the circumstances when the auditor's compliance with its professional standard of care is most critical. For that reason, the New Jersey Supreme Court has applied the *in pari delicto* defense differently as to auditors precisely because auditors are employed in part as a safeguard against managerial financial fraud. *See NCP*, 901 A.2d at 886 (refusing to apply imputation in a suit against an auditor because "third-party auditors are specifically retained for the task of monitoring corporate activity" and "[w]e also must seek to deter wrongdoing on the part of corporate auditors."). By contrast, under the New York approach, the innocent stockholders and independent directors who employ a "gatekeeper" to use its professional skills to help limit the potential for official wrongdoing thus have no remedy if the gatekeeper they have falls short of the professional mark.

Fourth, New York treats corporate auditors as if they are the same as genuine third-parties. In applying the traditional *in pari delicto* principles, there is good reason to cabin liability between co-conspirators. If two corporations conspired to commit illegal acts, it is rational for society to leave each co-conspirator where he stands, and refuse to make equitable adjustments to one party to an illicit endeavor. When, however, an agent of the corporation's independent directors is the subject of a suit for malpractice for the agent's failure to comply with professional standards, it punishes the innocent stockholders to immunize the auditors if the fraud their negligence left unrevealed was committed by corporate officers. In that scenario, neither the stockholders nor the board is complicit in the fraud. Immunizing the auditor does not aid genuine third-parties, as such immunity is not necessary for the corporation to be held responsible to third-parties for the insiders' official wrongdoing. All immunizing the auditor does is prevent the stockholders from recovering some of the harm suffered by the corporation (including the liability it owed to third-parties) from the auditors whose profes-

against PWC. Because the New York

sional negligence contributed to the loss. *See* A.C. Pritchard, *O'Melveny Meyers v. FDIC: Imputation of Fraud and Optimal Monitoring*, 4 Sup.Ct. Econ. Rev. 179, 192 (1995) ("The Cenco imputation rule invites fiduciaries to neglect their duty to ferret out fraud by corporate insiders because even if they are negligent, there will be no damages assessed against them for their malfeasance.").

Fifth, I do not understand how immunizing the auditors employed to help the independent directors monitor will make either stockholders or independent directors better monitors. I really do not get that.

Sixth, the adverse interest exception does little to make the New York approach coherent. For starters, a great deal of corporate financial fraud has as its motivation the artificial inflating of the corporation's own value, with resulting indirect enrichment of the wrongdoers through their compensation packages or stockholdings. If innocent stockholders and a board majority of independent directors exist who never authorized the wrongdoers to violate the corporation's legal charter by causing it to engage in business by unlawful means, why is no recovery allowed in those circumstances, but is allowed if the wrongdoers acted solely to benefit themselves? In this regard, the adverse interest exception really only addresses pure self-dealing or theft. And, to the extent that New York cases seem to intentionally distort the application of that test by deeming certain balance-sheet inflating conduct to be motivated solely by personal motivations despite its positive effect on the corporation's stock price and net worth, that illustrates the reluctance even New York courts have to apply *Wagoner* with full force. Applied faithfully to its words, the adverse interest exception is exceedingly narrow and does not cover cases like Enron, WorldCom, etc. Furthermore, to the extent *Wagoner* would allow the creditors of a corporation like AIG to sue the corporation's auditors on the corporation's behalf, it is incoherent. *See In re Mediators, Inc.*, 105 F.3d 822, 826 (2d Cir.1997) (indicating that under *Wagoner* any harm that creditors of a bankrupt corporation experienced because of a fraud can still be recovered in a suit by "creditors qua creditors"). I know no reason why creditors, particularly large ones, are naturally more disadvantaged than stockholders in their "monitoring" capabilities. If the reasoning of *Cenco* is taken seriously, bond holders should take it in the neck so that they will

bargain for tight contractual constraints on managerial discretion and for aggressive fraud audits. Hanging auditor liability on which corporate constituency—the creditors or the stockholder—can act as derivative plaintiffs does not have any apparent logic.

Finally, I note that one can quibble with *Wagoner* while still having doubt about the public policy utility of exposing audit firms to uncapped liability for their negligent failure to detect financial fraud by corporate managers. Although audit fees are lucrative, they arguably pale in comparison to the potential liability the auditors face. For example, here, AIG paid PWC around $213 million for years 2000 to 2004, but the liability PWC faces here could be up to several billion dollars. The even larger disproportion between independent directors fees and liability inspired § 102(b)(7) as well as the gross negligence standard Delaware corporate law applies in cases when a § 102(b)(7) clause does not apply. One can therefore understand the concern about the need to keep the auditor industry healthy, or to avoid the possibility that audit firms will suffer huge verdicts by fact-finders desirous of holding anyone they can liable for a fraud-based corporate meltdown or whose judgment about the auditor's capability to have detected the fraud through the use of professional diligence is compromised by hindsight bias. The *Wagoner* line of cases, however, does not address this issue in a direct or thoughtful way. Instead, it addresses the issue by rote, applying agency principles developed for other purposes. A more thoughtful tact, based on the use of heightened pleading standards (e.g., particularized fact pleading), standards of liability (e.g. gross negligence), proof (e.g. clear and convincing evidence), and measures designed to address liability (perhaps capping liability at some multiple of audit fees plus interest and clearly giving negligent audit firms full indemnification rights against any insider who acted with scienter) would be more directly responsive. As a second best, the *Wagoner* rule could just be explained as grounded in the notion that immunity for auditors is, in the view of New York policymakers, the best way to address an imperfect world.

For now, what I wish to make clear is that I apply *Wagoner* and its progeny because I must, and not because that rule represents a cogent, well-thought out approach that Delaware should adopt.

Court of Appeals has not addressed the applicable issues with certainty, I dismiss the claims without prejudice.[247]

### IV. *Conclusion*

For the foregoing reasons, the claims against the Employee Defendants (i.e., Michael Castelli, Christian M. Milton, Karen Radke, Carlos Coello) and PricewaterhouseCoopers LLP are dismissed without prejudice. The motions to dismiss or strike the First Amended Combined Complaint filed by defendants Maurice Greenberg, Edward E. Matthews, Thomas R. Tizzio, and Howard I. Smith are denied. **IT IS SO ORDERED.**

**247.** I dismiss without prejudice because the absence of a New York Court of Appeals ruling on point means that this question of law remains, to some extent unsettled, and thus to the extent that the New York Court of Appeals clarifies this matter, the Stockholder Plaintiffs should be able to bring their claims. *Cf.* N.Y. COMP.CODES R. & REGS. Tit. 22 § 500.27 (2009) (permitting a court of last resort to certify a question to the New York Court of Appeals).